**Sheldon G. ADELSON and Sandra Adelson**

v.

**The UNITED STATES.**

No. 112–76.

United States Claims Court.

Dec. 27, 1982.

Robert S. Lappin, Boston, Mass., attorney of record, for plaintiffs. Barry C. Klickstein and Lappin, Rosen, Goldberg, Slavet, Levenson & Wekstein, Boston, Mass., of counsel.

Ellen C. Specker, Washington, D.C., with whom was Asst. Atty. Gen. Glenn L. Archer, Jr., Washington, D.C., for defendant.

### OPINION

SPECTOR, Judge.

The issues in this tax case are whether various sums advanced by plaintiff[1] to a number of business entities, and not repaid, are debts, and if they are, whether they constitute business, rather than nonbusiness debts.

Section 166 of the Internal Revenue Code of 1954, as amended, allows as a deduction any debt which becomes worthless within the taxable year. Alternatively, at the discretion of the Secretary, it allows in lieu of such deduction a deduction for a reasonable addition to a reserve for bad debts.[2] The deduction is not, however, allowed in the case of a nonbusiness debt owed to a taxpayer other than a corporation, and the loss from a nonbusiness debt which becomes worthless was considered in that case to be a loss from the sale or exchange of a capital asset held for not more than 6 months. A nonbusiness debt is defined as one other than a debt which was created, or rendered worthless, in connection with a trade or business of the taxpayer.[3]

Whether a debt is or is not a business debt for federal income tax purposes involves a determination of the lender's "dominant motivation" in making the loan.[4] The question of whether a debt is a business or nonbusiness debt depends on the facts in each particular case.[5] A debt is one or the other in its entirety. The Code does not provide for allocation between business and nonbusiness portions.[6]

At a 2-day trial in Boston, Massachusetts, plaintiff presented a large number of witnesses, including himself and representatives of the various business entities to which sums had been advanced. He also introduced a large body of exhibit evidence. No witnesses were offered by defendant.

Based on the entire record, it is concluded that the funds advanced to the various business entities were in fact loans, that they were dominantly motivated by a legitimate

1. References to "plaintiff" are to Sheldon G. Adelson, whose business affairs are under examination herein. His wife, Sandra Adelson, is named as a party plaintiff solely because the couple filed joint returns for the taxable years in question.

2. 26 U.S.C. §§ 166(a) and (c).

3. 26 U.S.C. § 166(d).

4. *United States v. Generes,* 405 U.S. 93, 92 S.Ct. 827, 31 L.Ed.2d 62 (1972).

5. Treas.Reg. 166–5. A subsidiary issue in this case is whether interest payments made by the taxpayer on amounts which he borrowed for the purpose of reloaning the funds advanced to the various business entities, are deductible as business expenses. That subsidiary issue is governed by the same facts on which the main issue depends.

6. *See* note 4, *supra,* 405 U.S. at 96, 92 S.Ct. at 829.

business purpose, and that they qualify for treatment as business bad debts under Section 166 of the Code.

### Statement of Facts

Plaintiff's income tax return for 1969 reflected a net operating loss of $355,467.10 incurred in his trade or business. He sought first to carry the loss back to taxable year 1966, and then forward to succeeding taxable years until exhausted.[7] Accordingly, on March 2, 1971, he filed an amended return for taxable year 1968 reflecting a tax liability for that year of zero, and claiming a refund of the $189,493 payment made for that year. All but $25,986.84 of the claimed refund was disallowed by the Internal Revenue Service, resulting in this suit for the balance in the amount of $163,-506.16.

During taxable year 1969, plaintiff was engaged in the business of providing financial consulting services to clients for an agreed upon fee. His clients consisted of new, growth-oriented companies whose founders planned eventually to go public, but who lacked the business experience to do so without the assistance of a professional financial consultant. As such a consultant to his client-companies, plaintiff would undertake the task of formulating growth plans, dealing with lending institutions, and marshalling the other professionals (attorneys, accountants, underwriters) whose efforts were required to take these fledgling enterprises public.

During the mid-1960's, plaintiff was primarily a self-employed mortgage broker.[8] In that capacity he was retained by clients for the purpose of obtaining financing for the development of commercial real estate. Plaintiff would customarily conduct an economic feasibility study of the development project and summarize his findings in a report he would then submit to various lending institutions. In 1968, plaintiff switched the emphasis of his business from mortgage brokering to financial consulting in an effort to balance out the flow of his consultant fee income. It had been his experience that mortgage brokering was a highly cyclical business activity.

Plaintiff had acquired an apparently wide reputation as one very knowledgeable and effective in financial affairs.[9] As a result he was sought out by enough prospective clients plus referrals from friends and associates that it became totally unnecessary for him to advertise. As matters stood, he was accepting only about one out of every 20 or 30 prospective clients that came to his attention; yet he remained busy enough that 80 to 90-hour work weeks were the norm, and weekends or holidays devoted to leisure were the exception.

Typically, following acceptance of a client, plaintiff would arrange for the borrowing of the necessary funds to begin financing of the company's growth. In many cases the client-companies would be unable to obtain loans from traditional sources due to their speculative nature, or lack of collateral. Plaintiff would in these cases lend the client the required funds himself, out of his own capital, or out of funds he would personally borrow. The borrowed funds were loaned to the client-company at approximately the same bank interest rates which plaintiff was paying his lending institution. This was in exchange for an agreement by the client to retain plaintiff as a financial consultant on a longer-term basis than may have originally been contemplated. The arrangement ordinarily remained in effect indefinitely and until mutually discontinued. In exchange for his consultant services, plaintiff would bargain for and receive a monthly fee of from $500–$1500. On occasion, plaintiff would alternatively receive compensation in the form of stock or warrants of the client-company.

---

**7.** Plaintiff's 1966 and 1967 returns reflect nominal tax liabilities, paid in full. His tax liability for 1968 was computed to be $189,493, also paid in full.

**8.** Plaintiff's Schedule C for 1966 listed his principal business as "Mortgage Broker Financial Consultant." Schedule C for 1967 and 1968 identified his principal business as "Mortgage Broker."

**9.** This was due in part to his having realized a large profit on one of his stock investments.

Plaintiff made at least seven such short-term loans (3–6 months) to client-companies during 1968–69 and the loans remained unpaid in whole or in part at the end of 1969. The unpaid loans were generally unsecured, it being the expectation of both lender and borrower that repayment would be made from the proceeds of public offerings planned within the period of the loan, or within a renewal period of equally short duration.

These expectations were dashed in May of 1969 when "Black Tuesday" descended upon the stock market and particularly upon the new issues market. There was no recovery during the remainder of 1969. Several of the companies to which plaintiff had extended loans in anticipation of imminent and successful public offerings, eventually became insolvent. Faced with this state of affairs, plaintiff elected the reserve method of reporting business bad debts on his 1969 return.[10] In an amended petition, plaintiff claims an addition to his bad debt reserve in the amount of $222,500,[11] based on outstanding loan balances to seven companies totalling about $271,265.

## Discussion

■ Under the "dominant motivation" test earlier mentioned[12], if the lender's dominant motivation for making the loan was to advance a business interest (for example, to protect his position as an employee[13], or to support a fee-paying client)[14], then treatment of the debt as a business bad debt is appropriate. If, on the other hand, his dominant motivation was not to advance a business interest (for example, it was to protect the lender's equity interest in the borrower),[15] treatment as a business bad debt would not be appropriate. Section

166 of the Code and the relevant case law demonstrate that plaintiff is entitled to recover if he has established in the record the following factual predicates:

(1) Taxpayer was engaged in a trade or business during the period (1968–69) in which he advanced the sums in question.

(2) The advances constituted loans giving rise to bona fide debts.

(3) The debts were created or acquired in connection with the taxpayer's trade or business, or the loss from their worthlessness would be incurred in his trade or business.

As to the first point, plaintiff has established by overwhelming testimony of his former associates and client-companies that he was in the trade or business of providing financial consulting services to those clients for a fee. The record shows that his consultant business was so time-consuming as to render it impossible for him to have made a substantial commitment to any other trade or business during the relevant period. He maintained an office, hired a staff of assistants, and worked in excess of 60 hours a week as a financial consultant. The business was pursued with a profit motive. This issue is not in fact seriously contested by defendant.

■ On the second point, defendant argues that in at least three instances, the monies advanced should be regarded as contributions to capital, rather than loans. However, the authorities cited by defendant confirm plaintiff's characterization of the transactions as loans, rather than risk capital. In *Cuyuna Realty Co. v. United*

---

**10.** *See* text at note 2, *supra.* The reserve method avoids the necessity of proving the exact year and degree of worthlessness of specific debts, and allows instead the deduction of an amount adequate to absorb losses expected to be incurred on debts outstanding at the end of the taxable year, said amount to be added to a bad debt reserve. *See also* Ohl, *The Deduction for Bad Debts: A Study in Flexibility and Inflexibility,* 22 Tax Lawyer 579 (1969).

**11.** Plaintiff's original petition had claimed an addition of $242,500 to his bad debt reserve.

**12.** Note 4, *supra.*

**13.** *See Trent v. Commissioner,* 291 F.2d 669 (2d Cir.1961).

**14.** *See Frank A. Garlove* [Dec. 27,495(M) ], T.C. Memo. 1965–201 (1965).

**15.** *See* note 4, *supra.*

*States*,[16] the predecessor of this court distinguished a "loan" from "risk capital" by defining each as follows:

> * * * a loan is made upon the reasonable assumption that it will be repaid no matter whether the business venture is successful or not, while capital is put to the risk of the business.

Although the notes underlying these loans were usually drawn for a time certain, chosen to coincide approximately with the date of an anticipated public offering, the record establishes that the public offerings were to mark only *when* (not *whether*) the loans were to be repaid.[17]

As stated in *American Processing and Sales Co. v. United States:* [18]

> Where the borrower says the equivalent of "[w]e will not pay or even owe these advances if our business does not succeed," without question the advances would be more in the nature of capital contributions, and if the ultimate failure of the borrower precludes repayment, then no obligation is incurred. But this is quite different from the borrower stating "[w]e have reasonable grounds to believe that we shall be successful, and we shall use your advances to that end, repaying you as expected earnings permit." In each case the money is placed at the risk of the business, but no fixed, repayable obligation springs from the one as from the other. The real differences lie in the debt-creating intention of the parties, and the genuineness of repayment prospects in the light of economic realities.

Defendant suggests that because plaintiff made advances in two instances after the market for new public issues had collapsed, his expectation of repayment could not have been genuine. But the record shows that the slide in the market was expected to correct itself and that new enterprises were still attempting to go public in the early 1970's. If he did not think so, taxpayer would not have made the advances in any form. Defendant has not demonstrated that these two loans invalidated plaintiff's status as a creditor.

■ In a third instance, defendant argues that advances to the client-company, "Factory East", must be deemed capital contributions and not loans for a variety of reasons recited in its brief. Defendant assumes that plaintiff owned the stock in Factory East beneficially, rather than as a nominee for his brother. That is a finding that the court cannot make on this record. It is the testimony of the brothers that because of plaintiff's reputation in the business community, they found it necessary for plaintiff to act as his brother's nominee to facilitate the conclusion of certain financial transactions. Their uncontradicted testimony that they maintained a business relationship similar to those which plaintiff maintained with other non-related clients, is accepted as truthful. It strains credulity to assume, as defendant does, that plaintiff's brother would conceive a venture which he believed would earn him up to $5,000 per week, and transfer beneficial ownership to the taxpayer for the equivalent of a single week's profit. The brother, not taxpayer, is deemed to be beneficial owner of Factory East.

Nor is the absence of a fixed maturity date for the loans to Factory East deemed to be a serious impediment to a characterization of the advances as loans. It was the understanding of the parties that the funds would be repaid when available from anticipated profits. The absence of promissory notes, and of provisions for the payment of interest, can be regarded as a concession to the family relationship of the parties.

---

**16.**  180 Ct.Cl. 879, 884, 382 F.2d 298, 301 (1967).

**17.**  Plaintiff's uncontradicted testimony is as follows: "[I] never intended in any of the cases in which I loaned money, to keep the money outstanding for more than 30, 60, 90 days, give or take * * *. [I]t was only to cover the financial needs of a company so it could progress from one point to the next point. At the next point [usually the floating of a public offering] my money would be retired * * *. If I [had known] the company was not going to give me the money back, it is very clear that I would not have given it to them." (Tr. pp. 19, 20).

**18.**  178 Ct.Cl. 353, 378, 371 F.2d 842, 856 (1967).

Plaintiff's failure to reduce the Factory East obligation to judgment is explained by the fact that secured creditors had superior claims to all of the assets of the business when it failed, and filing of a lawsuit by plaintiff would have been futile. The fact that a bank would not readily extend credit to the company does not put Factory East in any different position than several of plaintiff's other client-companies, regarding which these same objections have not been raised.

Defendant would in effect have the court regard the Factory East advances as gifts. This would be in disregard of the substantial fee flowing back to plaintiff, as contracted for by the parties. If plaintiff had been inclined to make a gift of approximately $90,000 to Factory East, he could have done so at a greatly reduced income tax cost to himself by adjusting his consulting fee downward, rather than charging his brother a larger than average fee, paying income tax on it, and then returning the money in the form of a gift of after-tax dollars.

In summary, it is concluded on the record that each of the advances involved in this litigation were loans, and were intended as such by the parties to the respective transactions.

■ The third and last factual issue above listed, namely whether under the dominant motivation standard the debts were proximately related to plaintiff's trade or business, is at the core of this litigation. Both parties rely upon *Generes*[19] for a definition of the dominant motivation standard. In order for a debt to be deductible as a business bad debt, the taxpayer's dominant motive in making the loan

must have been to benefit his trade or business. In this case the taxpayer's business was that of a financial consultant.

The facts of record support plaintiff's position. He had developed an effective business system of securing open-ended consulting contracts from client businesses which had sought him out for his professional assistance. By advancing these fledgling companies the necessary financial assistance at bank interest rates, and at a stage of their economic development where bank financing would not ordinarily have been available, he received in return longer and more profitable consulting contracts than would ordinarily be expected. The consulting arrangements were made at arm's length and the testimony shows that both parties in each case deemed the arrangements to be in their respective best interests. Clearly the dominant motivation for the loans was to advance taxpayer's business as a financial consultant.

Noting that plaintiff was a minority shareholder in several of the client-businesses for which he acted as a financial consultant, defendant argues that his investment motive was therefore dominant. The *Generes* case[20] presented a set of facts in which the investment motive was found to be dominant. But there is little if any resemblance between the facts in that case and those presented here.[21] Furthermore there is no support whatever in *Generes* for application of a strict mathematical formula or analysis, as defendant urges upon the court in this case.[22] The decision in that case derived from a judicial analysis of all of the facts, to determine the dominant motivation of the taxpayer in making the loans.

---

**19.** Note 4, *supra.*

**20.** Note 4, *supra.*

**21.** *See* note 5, *supra,* illustrating that the issues in this type of case are unusually fact-intensive.

**22.** Under defendant's analysis, the "investment" side is comprised of the taxpayer's original stock investment translated into dollar terms, then *increased* by any existing debt obligations owed taxpayer by the borrower *prior* to

the loan under consideration. On the opposite side of the scale or balance, is placed the "business" factor, consisting of the taxpayer's annual salary reduced by his estimated income tax liability on that salary. Moreover, in this mathematical analysis no consideration is given to the fact that the salary is collected annually and represents a stream of income over several years with a present value in excess of a single year's earnings.

*Frank A. Garlove,*[23] presents facts strikingly similar to those present here. In *Garlove,* taxpayer was a practicing attorney who made loans to a client corporation in which he was also a minority shareholder. He testified that his purpose in making the loans was to enhance the prospect that the corporation would remain with him as one of his fee-paying clients. The opinion of the U.S. Tax Court is well worth quoting because of the factual similarity to this case. It held:

> It is agreed that the petitioner is not in the business of loaning money or of promoting, financing and managing business enterprises. The petitioner's only business is the practice of law, and his sole argument is that the loans in question were essential to, or so proximately related to his law practice that they could be said to have been made in connection with his practice. The respondent concedes that if the loans bear a sufficiently direct relationship to the petitioner's law practice, they may qualify as business debts, even though [petitioner's] business is not that of loaning money or promoting business enterprises. But the respondent argues that a sufficiently direct, proximate relationship between the petitioner's loans to his client and his law practice is not shown by the evidence to qualify these loans as business debts of the petitioner.

> Deciding if a loan is directly or proximately related to a taxpayer's law practice is in some respects more complicated than determining if a loan is proximately related to an individual's commercial business. The sources of supply, production processes, and sales outlets of a commercial enterprise are normally easy to identify. When such an enterprise is well established and its activities routine, it is usually easy to decide when a loan is directly or proximately related thereto.

> The instant case is more difficult. It is almost impossible to define the limits of a typical law practice. In its simplest form the practice of law involves the obtaining of legal work from organizations and individuals. There is no sure or easy way to develop clients or find legal work. Law suits and legal work cannot be bought and sold in the market place. Furthermore, a lawyer cannot lend money to an existing client with any assurance that this loan will necessarily result in legal work for him. Thus any loan, even to a client, has to be made only in the hope and expectation of future legal business.

> Petitioner did not have the benefit of lucrative retainers from large corporations. Like the great majority of lawyers his practice depended importantly upon reputation and referrals and a wide range of personal friendships. The petitioner's testimony showed that his sources of business were highly unpredictable.

> Partly because of this aspect of his practice and partly because clients can be capricious, the petitioner was interested in assuring himself a regular and dependable flow of fees. * * *

> The petitioner testified that his purpose in loaning money to [his client] was to support a regular, paying client and not to protect his capital investment. We deem this testimony reasonable and worthy of belief.

One can see that the facts in the instant case are even more persuasive since the plaintiff here was clearly engaged in a trade or business as a financial consultant where it is much easier to draw a proximate and direct relationship between the loans he made and his business.

As further stated in *Garlove,*[24] "the mere fact of stock ownership in the debtor corporation is not sufficient by itself to overcome the weight of petitioner's evidence that the *primary purpose* of the loan was to aid petitioner's business." (Emphasis supplied).[25]

---

**23.** *See* note 14, *supra.*

**24.** *See* note 14, *supra.*

**25.** Although *Garlove* predates the Supreme Court's opinion in *Generes* it applied the "dominant motivation" test, in effect, by finding as a

### Conclusions

All of the foregoing considered, plaintiff is entitled to recover on his tax refund claim. The amount of recovery must, however, await a remand to the Secretary of the Treasury. Where, as here, the taxpayer has elected the reserve method of treating bad debts under Section 166 of the Code, it must still be determined whether his deductions from income for an addition to the bad debt reserve were reasonable in amount, and whether any disallowance by the Secretary in his discretion, would be unreasonable. Because the Commissioner's rejection of plaintiff's claim did not reach that issue, the Secretary has yet to exercise the discretion vested in him by statute to determine the reasonableness of plaintiff's proposed addition to a bad debt reserve.[26]

Accordingly, the case is remanded under Rule 60.1(a) to the Secretary of the Treasury for his determination in accordance with Section 166 of the Code. For that purpose proceedings are stayed here for a period not to exceed 6 months. Counsel for the defendant shall report on the status of proceedings on remand at intervals of 60 days, beginning with the date of this decision. The parties shall thereafter proceed in accordance with Rule 60.1(b).

fact that the "primary purpose" of the loan was to aid petitioner's business.

**26.** As explained in *Roth Steel Tube Co. v. Commissioner,* 620 F.2d 1176, 1179 (6th Cir.1980), a "bad debt reserve is an estimate of the future losses which are expected to result from current business debts [citation omitted]. The taxpayer is permitted to take a deduction when he makes a 'reasonable addition' to the reserve rather than when a particular debt becomes worthless. When a debt becomes worthless, the taxpayer reduces the reserve by the amount of the worthless debt. A 'reasonable addition' to the reserve 'is the amount necessary to bring the reserve balance up to the level that can be expected to cover losses properly anticipated on debts outstanding at the end of the tax year.' "

The Supreme Court has described the limited judicial review available following the exercise of the Secretary's discretion, in these words:

"[T]he courts uniformly have held that the Commissioner's determination of a 'reasonable' (and hence deductible) addition must be sustained unless the taxpayer proves that the Commissioner abused his discretion. The taxpayer is said to bear a 'heavy burden' in this respect. He must show not only that his computation is reasonable, but also that the Commissioner's computation is unreasonable and arbitrary." *Thor Power Tool v. Commissioner,* 439 U.S. 522, 547–48, 99 S.Ct. 773, 788–89, 58 L.Ed.2d 785 (1979).