**Sheldon G. ADELSON and Sandra Adelson, Appellees,**

v.

**The UNITED STATES, Appellant.**

**Appeal No. 83–1300.**

United States Court of Appeals, Federal Circuit.

June 28, 1984.

Carleton D. Powell, Washington, D.C., argued for appellant. With him on the brief were Glenn L. Archer, Jr., Asst. Atty. Gen., Theodore D. Peyser, Jr. and Ellen C. Specker, Washington, D.C.

Timothy H. Gailey, Boston, Mass., argued for appellees. With him on the brief was Barry C. Klickstein, Boston, Mass., of counsel.

Before BENNETT, Circuit Judge, COWEN, Senior Circuit Judge, and MILLER, Circuit Judge.

BENNETT, Circuit Judge.

The government appeals from a judgment of the United States Claims Court (Spector, J.) holding that Sheldon G. Adelson (taxpayer)[1] is entitled to a refund of $163,506.16, plus interest, based on what the court determined was a reasonable addition to a bad debt reserve under I.R.C. § 166(c) (1982). In its initial opinion, the court held that taxpayer's advances to seven client-companies were bona fide debts, not capital contributions, and that his dominant motivation in creating the loans was to further his trade or business. 1 Cl.Ct. 61, 553 F.Supp. 1082 (1982). The court, however, ordered the case remanded to the Secretary of the Treasury for a determination of the reasonableness of taxpayer's proposed addition to a bad debt reserve. *Id.* 1 Cl.Ct. at 68–69. The government opposed the remand, arguing, *inter alia,* that the Secretary had already determined that no deduction was permitted under I.R.C. § 166 because taxpayer had not established that the advances were wholly or partially worthless at the close of 1969. In a second opinion, 2 Cl.Ct. 591 (1983), the court held that the government's method of determining a zero addition to a bad debt reserve was arbitrary, unreasonable, and an abuse of discretion, and thus taxpayer

was entitled to his claimed refund. *Id.* at 596. On a secondary issue, the court implicitly rejected the government's disallowance of a business expense deduction for interest paid on amounts used as advances to the client-companies. *See* 1 Cl.Ct. at 63 n. 5. We affirm-in-part, vacate-in-part, and remand.

## BACKGROUND

In summary, the Claims Court made the following findings of fact. A more detailed statement may be found at 1 Cl.Ct. at 63–64.

Taxpayer's income tax return for 1969 reflected a net operating loss of $355,-467.10 incurred in his trade or business. On March 2, 1971, he filed an amended return for 1968, claiming a refund of $189,-493 by reason of a carryback from 1969. All but $25,986.84 of the claimed refund was disallowed by the Internal Revenue Service, resulting in this refund suit for the balance of $163,506.16.

In 1969 taxpayer was engaged in the business of providing financial consulting services to clients for a fee. His clients consisted of new, growth-oriented companies which planned eventually to go public but lacked the business experience to do so without the assistance of a professional financial consultant.

After acceptance of a client, taxpayer would arrange for the borrowing of the necessary funds to begin financing the company's growth. In many cases the client-companies would be unable to obtain financing from traditional sources due to their lack of collateral or speculative nature. Taxpayer would in these cases lend the client the necessary funds himself, either out of his own capital or out of funds he would personally borrow. The borrowed funds were loaned to the client at about the same bank interest rates which he was paying to the lending institution. These advances to the client-companies were in exchange for an agreement by the

---

1. Sandra Adelson is a party solely by reason of the filing of joint returns for the years in question.

client to retain taxpayer as a financial consultant on a longer-term basis than may have been originally contemplated. The arrangement ordinarily remained in effect indefinitely and until mutually discontinued. In exchange for his consultant services, taxpayer would bargain for and receive a monthly fee of from $500–$1,500. On occasion, taxpayer would alternatively receive compensation in the form of stock or warrants of the client-company.

Taxpayer made at least seven short-term (3–6 months) loans to the client-companies during 1968 and 1969, and these loans remained unpaid in whole or in part at the end of 1969. The unpaid loans were generally unsecured, it being the expectation of both the lender and the borrower that repayment would be made from the proceeds of public offerings planned within the period of the loan, or within a renewal period of equally short duration.

These expectations were dashed in May of 1969 when "Black Tuesday" descended upon the stock market, and particularly the new issues market. Several of the companies to which taxpayer had extended loans in anticipation of imminent and successful public offerings eventually became insolvent. Faced with this state of affairs, taxpayer elected the reserve method of reporting business bad debts on his 1969 return. In an amended petition in the Claims Court, he claimed an addition to his bad debt reserve in the amount of $222,500, based on outstanding loan balances totaling about $271,265.

## DISCUSSION

The main issue on appeal is whether the Claims Court was correct in its conclusion that taxpayer was entitled to a deduction for a reasonable addition to a bad debt reserve, I.R.C. § 166(c), for the advances made to seven client-companies.[2] The Claims Court first determined whether these advances were incurred in connection with taxpayer's trade or business. This inquiry, in turn, depended upon the resolution of the following issues: (1) whether

taxpayer was engaged in a trade or business during the period in which the advances were made (1968–69); (2) whether the advances constituted loans giving rise to bona fide debts (debt versus capital contribution issue); and (3) whether taxpayer's dominant motivation in creating the debts was to further his trade or business (dominant motivation issue). 1 Cl.Ct. at 65.

The Claims Court's finding that taxpayer was in the trade or business of providing financial consulting services to the client-companies for a fee is not challenged on appeal. *See id.* Thus, we need only address the last two issues listed above.

## DEBT VERSUS CAPITAL CONTRIBUTION

■ Only a "bona fide debt" qualifies for a deduction under I.R.C. § 166. A "bona fide debt" is defined as "a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money." Treas.Reg. § 1.166–1(c) (1983). Contributions to capital are specifically excluded from I.R.C. § 166. *Id.* In *Cuyuna Realty Co. v. United States*, 180 Ct.Cl. 879, 382 F.2d 298, 301 (1967), the court distinguished between a "loan" and "risk capital":

> a loan is made upon the reasonable assumption that it will be repaid no matter whether the business venture is successful or not, while capital is put to the risk of the business. [Footnote omitted.]

*See also American Processing & Sales Co. v. United States*, 178 Ct.Cl. 353, 371 F.2d 842, 857 (1967) ("[t]he real differences [between a debt and a capital contribution] lie in the debt-creating intention of the parties, and the genuineness of repayment prospects in the light of economic realities").

Cases dealing with the debt versus capital contribution issue are legion, and a multitude of factors have been discussed in connection with the resolution of this issue. *See, e.g., Cuyuna Realty*, 382 F.2d at 302. This issue is essentially one of fact, and a

---

**2.** The government challenges the characterization of the advances made to Continental Travel, Entervolve, Cutlass Aviation, E.B.V. Systems, Orgonics, Factory East, and Farley-Nixon.

balancing of the relevant factors depends upon the unique circumstances of each case. *See Electronic Modules Corp. v. United States,* 695 F.2d 1367, 1371 (Fed. Cir.1982), and cases cited. As stated in *American Processing,* 371 F.2d at 848:

> each case must rest and be decided upon its own unique factual flavor, dissimilar from all others, for the intention to create a debt is a compound of many diverse external elements pointing in the end to what is essentially a subjective conclusion.

The Claims Court held that all of "the advances involved in this litigation were loans, and were intended as such by the parties to the respective transactions." 1 Cl.Ct. at 66. The government vigorously argues that this conclusion is in error, and that the court below resolved this issue in a conclusory fashion without consideration of the relevant factors.[3] According to the government, the following factors strongly suggest that taxpayer's motivations in making the advances were those of a "venture capitalist": (1) the client-companies could not obtain traditional financing; (2) they were undercapitalized; (3) all of the advances were unsecured; (4) in cases where maturity dates existed, they were not enforced; and (5) in most cases taxpayer owned either stock or rights to stock in the company.

Although we would have preferred a more detailed discussion of the objective factors supporting the Claims Court's conclusion, it is clear that there is adequate evidence in the record and the court's findings of fact to support affirmance. As this court has observed in *Electronic Modules,* 695 F.2d at 1372:

> The weighing of different factors is a task committed largely to the discretion of the trial court, and one that an appellate court is ill-equipped to perform. [Citations omitted.]

In any event, it is evident from the Claims Court's findings and the record that the following factors support the court's holding that the advances were bona fide debts: (1) the uncontradicted testimony of the parties established that their intent was to treat the advances as loans; (2) at the time the loans were made there was a reasonable expectation of repayment; (3) where taxpayer held an equity interest, it consisted of only a small minority interest; and (4) the advances were not made in proportion to shareholdings.

■ A factor that is particularly significant in this case is that taxpayer had at best a minor equity interest in the client-companies.[4] It is clear from the facts that, with the possible exception of Factory East,[5] taxpayer was dealing with the client-companies as an "outsider," i.e., whatever

---

**3.** On appeal, the government asserts that none of the advances made to the seven client-companies qualified as a bona fide debt. Before the Claims Court, however, the government only challenged the characterization of the advances made to Entervolve, Orgonics, and Factory East. The government also challenged the advance made to Farley-Nixon because of the lack of evidence presented by taxpayer concerning this transaction. In light of our disposition of this issue, we need not decide whether the government is precluded from challenging the advances made to the other client-companies.

**4.** Taxpayer had only a 1.5-percent interest in Continental Travel, a 1.9-percent interest in Entervolve, a 3.2-percent interest in Cutlass, a 3.5-percent interest in E.B.V., and a 1.4-percent interest in Orgonics. Although taxpayer's relationship with Factory East significantly differs from that with the other client-companies, we are satisfied that the Claims Court correctly concluded that these advances were intended as

loans. *See* discussion 1 Cl.Ct. at 66. Although the government characterizes as "bizarre" the Claims Court's conclusion that taxpayer's brother was the beneficial owner of Factory East, and thus taxpayer held no equity interest in this company, it does not challenge this finding. Finally, Farley-Nixon was a partnership, and the issue of debt versus capital contribution is rarely raised in a noncorporate setting. *But see Hambuechen v. Commissioner,* 43 T.C. 90 (1964). We agree with the government, however, that there is a dearth of information regarding taxpayer's advance to Farley-Nixon, and what equity interest, if any, he held in the partnership. In light of our remand on the dominant motivation issue, *infra,* additional information regarding taxpayer's advance to Farley-Nixon should be presented, and if the evidence fails to show that this advance constituted a bona fide debt, then taxpayer would not be entitled to a $5,000 deduction under I.R.C. § 166.

**5.** *See supra* n. 4.

equity interest he owned or position of responsibility with the company he assumed (e.g., as a director) would not enable him to control the company's daily business affairs to his advantage. In the typical case in which the debt versus capital contribution issue is raised, the taxpayer has a controlling interest in the corporation to which the advances are made. *E.g., Electronic Modules*, 695 F.2d at 1368 (advances to a wholly owned subsidiary), *Cuyuna Realty*, 382 F.2d at 299 (advances to a wholly owned subsidiary), *American Processing*, 371 F.2d at 843 (advances to a related corporation). In a case. in which there is a complete identity of ownership between the creditor and debtor, there is a far greater likelihood that the purported loan is actually a disguised·capital contribution, as this arrangement would permit a 100-percent shareholder to obtain certain tax advantages, such as an ordinary loss under I.R.C. § 166 if the debt became worthless, or a tax-free return of principal, without affecting the shareholder's control of the debtor corporation.[6] Where, as here, the taxpayer has only a small equity interest in the debtor companies, this objective fact adds greater credibility to the subjective testimony of the parties regarding their debt-creating intentions.

Given the totality of circumstances relevant to the debt versus capital contribution issue, and the traditional deference appellate courts afford to a trial court's determination of this fact-intensive issue, we affirm the Claims Court's holding that taxpayer's advances to the client-companies were bona fide debts.[7]

## DOMINANT MOTIVATION

■ The Claims Court stated that the issue of whether the "dominant motivation" of taxpayer in making the loans was to further his business interest (fees paid for financial consulting) or his equity interest (protection of his investment or anticipated profits from the sale of securities) is

"at the core of this litigation." 1 Cl.Ct. at 66. The lead case in this area is *United States v. Generes*, 405 U.S. 93, 92 S.Ct. 827, 31 L.Ed.2d 62 (1972), where the Court held that in order for a debt to be deductible as a business bad debt under I.R.C. § 166, the taxpayer's dominant motivation in making the loan must have been to benefit his trade or business. A nonbusiness debt which becomes worthless is treated as a short-term capital loss. I.R.C. § 166(d). As mentioned, the Claims Court here found that taxpayer was in the business of providing financial consulting services to the client-companies for a fee.

The Claims Court held for the taxpayer on this issue:

> By advancing these fledgling companies the necessary financial assistance at bank interest rates, and at a stage of their economic development where bank financing would not ordinarily have been available, [taxpayer] received in return longer and more profitable consulting contracts than would ordinarily be expected. The consulting arrangements were made at arm's length and the testimony shows that both parties in each case deemed the arrangements to be in their respective best interests. Clearly the dominant motivation for the loans was to advance taxpayer's business as a financial consultant.

1 Cl.Ct. at 67. The Claims Court rejected the government's contention that taxpayer's dominant motivation was to protect his minority shareholder interest in the client-companies, stating that the facts in *Generes* were distinguishable from this case, and further noting that "there is no support whatever in *Generes* for application of a strict mathematical formula or analysis ...." *Id.* The court then stated that the case of *Frank A. Garlove*, 24 TCM (CCH) 1049 (1965), "presents facts strikingly similar to those present here." *Id.* In *Garlove*, an attorney was allowed a business bad debt deduction for loans to a client-cor-

---

6. Of course, the presence of this factor is seldom determinative in and of itself. *See, e.g., Electronic Modules* where a corporation was permitted a bad debt deduction for advances made to its wholly owned subsidiary.

7. *But see supra* n. 4 regarding taxpayer's advance to Farley-Nixon.

poration in which he was also a minority shareholder. After quoting at length from *Garlove,* the Claims Court commented that "the facts in the instant case are even more persuasive" because "it is much easier to draw a proximate and direct relationship between the loans [taxpayer] made and his business," and, thus, concluded that taxpayer's business motive was dominant. *Id.* 1 Cl.Ct. at 68.

The government asserts that taxpayer has failed to prove that his business interest was dominant. The government notes that the financial success of the client-companies would not only increase the taxpayer's expectation of profit from his consulting business, but his equity interest in those companies as well. The government also asserts that even if the businesses were successful, the consulting agreements could be terminated, whereas his stock interest could not.[8] From the foregoing, the government concludes that "any type of meaningful objective financial analyses of the two interests, along the lines of *Generes,* is virtually impossible. The best that can be said is that, in theory, the two interests are in equipoise."

Contrary to the government's assertion, this is precisely the type of case that would benefit from an analysis along the lines of *Generes.* In *Generes,* the taxpayer made advances to and signed an indemnity agreement for the benefit of a family-owned corporation in which he owned 44 percent of the stock. The taxpayer asserted that his dominant motivation was to protect his employee status (business interest), and not his equity interest in the corporation. This is precisely the type of situation where any loan or guarantee for the benefit of the corporation would promote the taxpayer's status as an employee and as a shareholder in equal measure. The Court, therefore, compared the risk versus the potential reward to these two interests, and concluded that the amount of the taxpayer's salary

compared to the amount invested in the corporation was too small to justify a business bad debt deduction. 405 U.S. at 106–07, 92 S.Ct. at 834–35.

Even if *Generes* does not mandate the application of a "strict mathematical formula or analysis," that case *does* stand for the proposition that, in the analysis of dominant motivation, the trier of fact should "compare the risk against the potential reward and give proper emphasis to the objective rather than the subjective." *Id.* at 104, 92 S.Ct. at 833. In *Generes,* the Court discounted the self-serving statements of the taxpayer regarding his dominant motivation, and instead focused on an objective comparison of his salary (his business interest) vis-a-vis his investment in the corporation that employed him (his equity interest), concluding that his equity interest was dominant, and thus he was not entitled to a business bad debt deduction. *Id.* at 106–07, 92 S.Ct. at 834–35.

Our difficulty with the Claims Court's opinion centers on the lack of any "objective" analysis along the lines of *Generes.* As far as we can gather, the Claims Court's conclusion regarding dominant motivation was based primarily, if not exclusively, on the testimony of taxpayer and his witnesses.[9] While we do not mean to belittle the importance of such evidence, we cannot effectively review the Claims Court's holding in the absence of any factual findings or discussion regarding the benefits that might have inured to taxpayer's business interest (actual or potential income from consulting fees) as compared to his equity interest in the client-companies (e.g., stock, options, warrants). We emphasize that the determination of dominant motivation need not depend on a "mathematical analysis" whereby the investment in or potential reward to each interest is tallied up, with the larger figure conclusively establishing which interest was dominant.[10] We agree with the Claims Court's

---

**8.** The Claims Court, however, found that the consulting agreements "ordinarily remained in effect indefinitely and until *mutually* discontinued." *Id.* at 64 (emphasis added).

**9.** As pointed out in the Claims Court's opinion, the government offered no witnesses of its own. 1 Cl.Ct. at 63.

**10.** However, in a situation similar to that in *Generes,* where the equity interest is greatly

statement that the determination of dominant motivation depends upon "a judicial analysis of *all* of the facts," 1 Cl.Ct. at 67 (emphasis added), but without a more complete record of the relevant facts, we cannot determine on review the correctness of the court's holding. Even in *Garlove,* so heavily relied upon by the Claims Court, the court emphasized that the taxpayer's capital investment in the client-company was greatly overshadowed by the importance of this client to his law practice. 24 TCM at 1053.[11]

We therefore remand to the Claims Court for additional findings, and discussion incorporating those findings, regarding the taxpayer's business interest as compared to his equity interest. Given the complexity of the facts surrounding these loans, a comparison on a company-by-company basis would be helpful. It is up to the Claims Court, however, to decide the weight to be accorded these findings. In the event the Claims Court decides that any of the loans were not made pursuant to a dominant motivation to further taxpayer's business interest, the court should redetermine the amount subject to an allowance for addition to the bad debt reserve.

### CONCLUSION

Because of our remand on the dominant motivation issue, any decision by this court on the issue of the Secretary's denial of an addition to a bad debt reserve would be premature, as only a business bad debt would qualify for use of the reserve method under I.R.C. § 166(c). Similarly, the issue of whether taxpayer can deduct, as a business expense, interest paid on the loans used for the advances made to the client-companies depends upon the trial court's resolution of the dominant motivation issue.

disproportionate to the business interest, such a comparison may prove to be dispositive.

**11.** In *Garlove,* the court made extensive factual findings regarding the taxpayer's capital investment, the difficulty in selling his stock holdings in the client-company, the fact that the taxpayer had never sold any of the client's stock, the amount of fees paid to the taxpayer by client-companies to which he had made loans, and the

In summary, the Claims Court's holding that the advances made to the client-companies were bona fide debts is generally affirmed.[12] The Claims Court's holding that taxpayer's dominant motivation in making the loans was to further his business interest is vacated, and the case is remanded to the Claims Court for additional findings on this issue in light of this opinion.

AFFIRMED–IN–PART, VACATED–IN–PART, AND REMANDED.

importance of these clients to his business interest. *24 TCM* at 1050–51, 1053. It was in light of this background that the court concluded that the taxpayer's testimony regarding his motivation for the loans was "reasonable and worthy of belief." *Id.* at 1053.

**12.** *See supra* n. 4 regarding the advance to *Farley-Nixon.*