**Sheldon G. ADELSON and Sandra Adelson**

v.

**The UNITED STATES.**

**No. 112–76.**

United States Claims Court.

Sept. 12, 1984.

Robert S. Lappin, Boston, Mass., for plaintiffs; Barry C. Klickstein and Slavet & Westcott, Boston, Mass., of counsel.

Ellen C. Specker, Washington, D.C., with whom was Asst. Atty. Gen. Glenn L. Archer, Jr., Washington, D.C., for defendant.

## OPINION

SPECTOR, Senior Judge.

This is the third decision on this taxpayer's refund claim. It is required by an opinion of the United States Court of Appeals for the Federal Circuit (Bennett, J)[1] in which it is ordered and adjudged with respect to the prior two opinions:

> AFFIRMED IN PART, VACATED IN PART, AND REMANDED, to the Claims Court for additional findings, regarding

---

1. *Adelson v. U.S.,* 737 F.2d 1569 (1984).

the taxpayer's business interest as compared to his equity interest.

This mandate requires a recapitulation of the two prior Claims Court decisions, and of the total record on which they are based.

## I. *U.S. Claims Court Decision of December 27, 1982.*[2]

It was found that plaintiff was engaged in the business of providing financial consulting services to clients for an agreed upon fee. His clients consisted of new, growth oriented companies whose founders planned eventually to go public, but who lacked the business experience to do so without the assistance of a professional financial consultant. Plaintiff's services consisted of formulating growth plans, dealing with lending institutions, and marshalling the other professionals (attorneys, accountants, underwriters) whose efforts were required to take these enterprises public.[3] It was further found that in many cases the client companies were unable to obtain loans from traditional sources due to their speculative nature, or lack of collateral. In those instances, plaintiff would himself lend the client the required funds out of his own capital, or out of funds he would personally borrow and re-lend at approximately the same rates he paid his lending institution.

There was no profit in the loans themselves. The *quid pro quo* flowing to the plaintiff was the borrower's agreement to retain plaintiff as a financial consultant for an indefinite but appreciably longer period of time. For these consultant services, plaintiff would negotiate and receive a monthly fee of from $500 to $1,500. The record shows that on occasion plaintiff would alternatively receive compensation for his services in the form of stock or warrants of the client-company.[4] The borrowers became insolvent and the plaintiff taxpayer elected the reserve method[5] of reporting the defaulted loans as business bad debts on his return.

It is again emphasized that the conclusions expressed in this Claims Court opinion are based on a two day trial at which plaintiff presented nine witnesses (including the debtors), all of whom described the nature of these loans, their relationship to plaintiff's financial consulting business, and the absence of any relationship to plaintiff's investments. Defendant presented no witnesses. In addition, plaintiff introduced 27 exhibits into the record. Defendant introduced four exhibits, two of which had been furnished by the plaintiff.

On the basis of that record, the Claims Court found that the funds advanced to the various client companies were loans, and not contributions to equity; that the dominant motive for these loans was to advance plaintiff's business as a financial consultant, and that they were not gifts, nor were they to protect any minor equity interest in the debtors; and that they therefore qualified for treatment as business bad debts under Section 166 of the Code. The evidence of record in this fact-intensive case is overwhelmingly in support of the above conclusions. There is, in fact, no evidence in the record which would support contrary findings. It was found that the debts were created in connection with the taxpayer's business as a financial consultant and when they became worthless the resultant losses were therefore business related.

The uncontradicted testimony of record is that these loans were made upon the reasonable assumption that they would be repaid, whether or not the borrowers' business ventures were successful. In other words, the funds advanced were not put at the risk of the borrowers' business ventures.[6]

Because plaintiff was also a minority shareholder in several of the client businesses which he was serving as a financial

---

2. *Adelson v. U.S.,* 1 Cl.Ct. 61, 553 F.Supp. 1082 (1982) [hereinafter cited as *Adelson I*].

3. *Id.* at 63, 553 F.Supp. at 1082.

4. *Id.* at 64, 553 F.Supp. at 1084.

5. 26 U.S.C. § 166(c).

6. *Adelson I,* 1 Cl.Ct. at 65, 553 F.Supp. at 1085–6.

consultant, defendant offered an argument (not evidence) that his dominant motive in making the loans must therefore have been to protect his investments. Defendant introduced no facts to support that argument. The Claims Court found that these are fact-intensive cases, and that the result must be determined in each case based on the facts in that particular case, following a judicial analysis of all of the facts.[7]

The facts in *Frank A. Garlove*[8] were found to be "on all fours" with those developed in this case. *Garlove*, a practicing attorney, made loans to a client-company in which he was also a minority stockholder. He testified that his purpose was to enhance the prospect that the corporation would remain with him as one of his fee-paying clients. The Tax Court concluded:

> The petitioner testified that his purpose in loaning money to (his client) was to support a regular paying client and not to protect his capital investment. We deem this testimony reasonable and worthy of belief.... [T]he mere fact of stock ownership in the debtor corporation is not sufficient by itself to overcome the weight of petitioner's evidence that the primary purpose of the loan was to aid petitioner's business.

In the instant case, there was not only the testimony of the taxpayer to support that conclusion, but also the confirming testimony of the debtor-companies, and of others familiar with the overall nature of his financial consulting service.

The case was remanded to the Secretary of the Treasury to determine whether the taxpayer's deductions from income for an addition to his bad debt reserve, were reasonable in amount.

## II. U.S. Claims Court Decision of June 14, 1983.[9]

Defendant filed a Motion for Rehearing and to Reopen Proof addressed solely to the propriety of a remand to the Secretary of the Treasury[10] to determine whether the taxpayer's deductions from income for an addition to a bad debt reserve, were reasonable in amount. Counsel for defendant argued somewhat inconsistently that:

A. Tax cases are not "appropriate matters" for remand.

B. A remand is unnecessary because the Secretary has already determined that the advances did not become worthless at the end of the year in question.[11]

C. The Secretary has already exercised his discretion to determine the reasonableness of the amount of the reserve addition claimed as a deduction.[12]

The plaintiff responded that "[t]he Court had before it expert testimony as to the reasonableness of the additions to the bad debt reserve. Defendant offered nothing whatsoever on this issue."[13]

---

**7.** In accordance with the holding in *United States v. Generes*, 405 U.S. 93, 92 S.Ct. 827, 31 L.Ed.2d 62 (1972). In *Generes*, the taxpayer drew an annual salary of $12,000 from a family corporation in which he had invested $38,000 and to which he had loaned $158,000. On the totally different facts in *Generes*, the Supreme Court found, under the "dominant motivation" test, that the *Generes* loans were not dominantly motivated by a business purpose (preservation of his $12,000 job). *See also infra*, note 22.

**8.** 24 TCM (CCH) 1049 (1965).

**9.** *Adelson v. U.S.*, 2 Cl.Ct. 591 (1983) [hereinafter cited as *Adelson II*].

**10.** *Adelson I*, 1 Cl.Ct. at 69, 553 F.Supp. at 1089.

**11.** This argument evidenced confusion regarding the difference between a claimed deduction

for a business debt which *became worthless* within the taxable year (26 U.S.C. § 166(a)); and a claimed deduction for a reasonable addition to a *reserve for bad debts outstanding* at the end of the taxable year. (26 U.S.C. § 166(c)). *See Adelson II*, 2 Cl.Ct. at 592–94.

**12.** *Adelson II*, 2 Cl.Ct. at 593–94.

**13.** Citing defendant's references to "worthlessness at the end of the year in question," plaintiff noted that "[t]his demonstrated inability of the defendant at administrative levels, from appellate conferee to Secretary of the Treasury, to distinguish between the standard applicable to allowance of a bad debt deduction and to an addition to a bad debt reserve is cause for great concern among those who must regularly deal with the Service on behalf of their clients or themselves." *Adelson II*, 2 Cl.Ct. at 594.

This court found it "apparent from the foregoing that both parties now believe that a remand to the Secretary is unnecessary and futile." It was concluded that the remaining issue to be decided on defendant's motion was as follows:

Was plaintiff's addition to a reserve for bad debts reasonable in amount, and, if so, did the Secretary abuse his discretion in disallowing it in its entirety.

As in the case of the original decision of December 27, 1982[14], the Claims Court determined that this issue was to be resolved in accordance with the facts in each particular case. The uncontradicted testimony of plaintiff's expert witness[15] was that the additions to the reserve were reasonable in amount, and properly made. The defendant offered no computation in rebuttal, and it has moreover, disallowed the proposed deduction in its entirety, based on a misinterpretation of Code § 166(c).[16] The court concluded that "[p]laintiff is entitled to a reasonable addition to a reserve account for bad debts and the amounts added have been shown on this record to be reasonable."[17]

The case is now again before the court on remand from the Court of Appeals for the Federal Circuit (CAFC).[18] In its decision, the CAFC reviewed the three closely related factual issues before the Claims Court in its decision of December 27, 1983.[19] It found that the first issue (whether or not plaintiff was in the trade or business of providing financial consulting services) was not challenged on appeal. As to the second issue (whether the advances constituted loans giving rise to bona fide debts, rather than capital contribu-

tions), it found that this was essentially an issue of fact dependent on the unique circumstances of each case[20], and further concluded that "it is clear that there is adequate evidence in the record and the court's findings of fact to support affirmance." The CAFC quoted from its prior decision in *Electronic Modules*, 695 F.2d at 1372:

The weighing of different factors is a task committed largely to the discretion of the trial court, and one that an appellate court is ill-equipped to perform. (Citations omitted.)

The CAFC opinion recites the following findings and references to the record in support of the Claims Court's holding that the advances were bona fide debts:

(1) the uncontradicted testimony of the parties established that their intent was to treat the advances as loans; (2) at the time the loans were made there was a reasonable expectation of repayment; (3) where taxpayer held an equity interest it consisted of *only a small minority interest;* and (4) the advances were *not made in proportion to shareholdings.* (Emphasis supplied)

It goes on to conclude:

A factor that is particularly significant in this case is that taxpayer had at best *a minor equity interest* in the client companies.[4] ... Where, as here, the taxpayer has only a *small equity interest* in the debtor companies, this objective fact adds greater credibility to the subjective testimony of the parties regarding their debt-creating intentions.

---

14. *Adelson I,* 1 Cl.Ct. 61, 553 F.Supp. 1082 (1982).

15. *Adelson II,* 2 Cl.Ct. at 592.

16. 26 U.S.C. § 166(c). *See Adelson II,* 2 Cl.Ct. at 595.

17. *Adelson II,* 2 Cl.Ct. at 596.

18. *Adelson v. U.S.,* 737 F.2d 1569 (1984).

19. *Adelson I,* 1 Cl.Ct. at 65, 553 F.Supp. at 1085.

20. Citing *Electronic Modules Corp. v. U.S.,* 695 F.2d 1367, 1371 (Fed.Cir.1982); and *American*

*Processing & Sales Co. v. U.S.,* 178 Ct.Cl. 353, 378, 371 F.2d 842, 857 (1967). As stated in *American Processing,* 178 Ct.Cl. at 363, 371 F.2d at 848:

"... but in the final analysis each case must rest and be decided upon its own unique factual flavor, dissimilar from all others, for the intention to create a debt is a compound of many diverse external elements pointing in the end to what is essentially a subjective conclusion."

Given the totality of circumstances relevant to the debt versus capital contribution issue, and the traditional deference appellate courts afford to a trial court's determination of this fact-intensive issue, we affirm the Claims Court's holding that taxpayer's advances to the client-companies were bona-fide debts. (Emphasis supplied)

The endorsement of the Claims Court's holding on the above fact-intensive issues has a strong bearing on the closely related and equally fact-intensive issue of "dominant motivation." Given the "small minority" and "minor equity interest" held by plaintiff and the disproportionately larger loans advanced by taxpayer to the client-companies, it is not likely that the loans were dominantly motivated by a desire to protect the taxpayer's minor equity interest. It is far more credible that the dominant motivation for the loans was, as in *Garlove* [21], to benefit plaintiff's business as a financial consultant.[22]

As earlier stated, the case has now been remanded with the following explanation and instructions:

We agree with the Claims Court's statement that the determination of dominant motivation depends upon 'a judicial analysis of *all* of the facts,' 1 Cl.Ct. at 67 (emphasis added), but without a more complete record of the relevant facts, we cannot determine or review the correctness of the court's holding. Even in *Garlove,* so heavily relied upon by the Claims Court, the court emphasized that the taxpayer's capital investment in the client-company was greatly overshadowed by the importance of this client to his law practice. TCM at 1053.

We therefore remand to the Claims Court for additional findings, and discussion incorporating those findings, regarding the taxpayer's business interest as compared to his equity interest. Given the complexity of the facts surrounding these loans, a comparison on a company-by-company basis would be helpful. It is up to the Claims Court, however, to decide the weight to be accorded these findings. In the event the Claims Court decides that any of the loans were not made pursuant to a dominant motivation to further taxpayer's business interest, the court should redetermine the amount subject to an allowance for addition to the bad debt reserve.

Additional findings, and discussion incorporating those findings, regarding the taxpayer's business interest as compared to his equity interest, are as follows. A Stipulation of Facts,[23] recites that the debtor Continental Travel, Ltd. (CTL) was engaged in the business of arranging and conducting all-expense paid package tours on a charter flight basis. On October 15, 1968, the sum of $200,000 was advanced to CTL for 60 days by plaintiff and CTL's Chairman and Executive Vice-President. Plaintiff's share was $66,000. It is stipulated that plaintiff personally borrowed $59,995 to contribute his share of the advance to CTL. As of December 1968, plaintiff owned the following interests in CTL:

| Preferred Stock, | 223 shares out of 4,473 outstanding. |
| Common Stock, | 23,141 shares out of 1,500,000 outstanding. |
| Warrants, | 13,333 out of 141,000 outstanding. |

Plaintiff was not repaid the $66,000 which he had advanced to CTL.

The debtor Robert Lawrence Productions, Inc. was engaged in the business of motion picture production. The name of the corporation was changed to Entervolve. During 1968–9, plaintiff advanced $51,300

---

**21.** 24 TCM (CCH) 1049 (1965).

**22.** The CAFC opinion confirms that in *Generes* (note 7, *supra*) the business interest of the taxpayer was his employee status with a family-owned corporation. In contrast, he owned 44 percent of the stock of the corporation to which he advanced the loans at issue. The CAFC opinion stated: "The Court, therefore, compared the risk versus the potential reward to these two interests, and concluded that the amount of the taxpayer's salary compared to the amount invested in the corporation was too small to justify a business bad debt deduction."

**23.** Joint Exhibit 1.

to Entervolve, all of which he had previously borrowed. Of this amount, $20,000 was repaid and the balance of $31,000 was not repaid. Entervolve filed a petition in bankruptcy on April 14, 1972.

The debtor Cutlass Aviation Inc. (formerly Buker Airways, Inc.) was loaned $62,101 by plaintiff. Plaintiff owned 21,000 shares of stock in Cutlass out of 650,000 shares outstanding. He purchased the 21,000 shares for $7,000, by means of a promissory note. The funds advanced to Cutlass by plaintiff were in turn borrowed by him from a bank. Cutlass repaid $8,500 of this advance and the balance has not been repaid. In addition, plaintiff guaranteed a bank loan to Cutlass in the amount of $100,000. Plaintiff paid $3,045 on this guarantee in 1969 and $3,270 in 1978.

The debtor E.B.V. Systems, Inc. was engaged in the business of developing and manufacturing a ball-type valve. Plaintiff owned 20,000 shares of E.B.V. out of 566,-670 outstanding. He purchased the shares for $106 in 1968 and sold them three years later for $10,650. Plaintiff advanced $115,-000 to E.B.V. in 1968-9. These advances were made from a line of credit which plaintiff had in turn developed at his bank. The advances to E.B.V. were secured by notes. E.B.V. repaid $96,000. Plaintiff received $350 from E.B.V. in 1969 as a fee, and was owed $11,000 in consulting fees. Plaintiff was obliged under a financing program designed to avert bankruptcy by E.B.V., to convert the $19,000 still owed on his advances of $115,000, plus the $11,000 in unpaid consulting fees, plus unpaid interest on the advances in the amount of $2,533, into 16,500 shares of E.B.V. stock at $2 per share. In addition, plaintiff guaranteed loans by others to E.B.V. during 1969, in the amounts of $60,000; $210,000; $105,000; and, $42,000.

The debtor Factory East Inc. was a discotheque. Plaintiff advanced $23,235 to Factory East in 1969. Of the amounts advanced, only $5,500 was repaid. The funds advanced had in turn been borrowed by plaintiff from a bank. In addition, plaintiff guaranteed loans of $10,008 and $17,040 from another corporation to Factory East. He has paid $4,621 on the latter guarantee.

The debtor Orgonics was engaged in the commercial application of organic waste products. Plaintiff acquired an option to purchase, at par, 30,000 shares of Orgonics one-cent par value stock. This option was thereafter assigned away to others.

The debtor Farley-Nixon Company was a partnership organized to sell school furniture in South America. Plaintiff advanced $5,000 to the Company and was repaid only $113.

In addition to the above *stipulated* facts relevant to the remanded issue, the following additional and relevant facts are gleaned from the transcript of the trial and the trial exhibits.

Plaintiff would ordinarily select only a few of the many enterprises brought to his attention, and would agree to secure necessary financing, or would himself advance short term loans to those selected, with the understanding that the borrowers would retain him as a financial consultant for an extended period of time.[24] The nature of plaintiff's financial consulting business was confirmed by an associate [25], as well as by a stock broker who often referred these emerging enterprises to plaintiff.[26]

Plaintiff had a written agreement with E.B.V. to serve as its financial consultant.[27] The loans to E.B.V. were motivated by plaintiff's desire to advance his business as a financial consultant.[28] This was confirmed by the President of E.B.V.[29]

Plaintiff also acted as a financial consultant to Entervolve, and loaned that company

---

**24.** Transcript 16, 17, 18, 19, 20, 22, 23, 30, 36, 38, 39.

**25.** *Id.* at 40, 44, 45.

**26.** *Id.* at 46, 47, 48, 49, 50, 51, 54, 55, 56.

**27.** *Id.* at 58–61.

**28.** *Id.* at 62–66.

**29.** *Id.* at 70–76, 78.

money which was not fully repaid.[30] The treasurer of Entervolve confirmed this testimony.[31]

Plaintiff served as a financial consultant to Cutlass[32] and advanced funds to Cutlass[33] which were not repaid.[34] An officer of Cutlass confirmed these facts.[35]

Plaintiff had a similar arrangement with Continental Travel.[36] The co-founder of this Company likewise confirmed plaintiff's testimony.[37]

The similar arrangement with Factory East, Inc. involved plaintiff and his brother Leonard Adelson.[38] Plaintiff received no financial consulting fees from Factory East[39] although the understanding was that he would receive $500 per week as a financial consultant to Factory East.[40]

With respect to Orgonics, plaintiff testified to a $25,000 loan, and to a similar arrangement with that company, confirmed by a written agreement.[41]

An expert witness,[42] well recognized as a tax specialist, testified as to the reasonableness of the proposed additions to plaintiff's bad debt reserve based on the existence of the above-described unsecured loans and the likelihood of their being repaid. With respect to the $66,000 owed by CTL, the witness was of the opinion that a $60,000 addition to a bad debt reserve was reasonable.[43] With respect to a second outstanding loan of $62,235 to Cutlass, the witness was of the opinion that an addition to the reserve of $55,000 was reasonable.[44] With respect to the E.B.V. outstanding loan balance in the amount of $19,000, the witness was of the opinion that an addition to the reserve of $15,000 would be reasonable.[45] As to a fourth debt balance of $31,300 owed by Entervolve, the witness testified that an addition to the reserve of $15,000 would be reasonable.[46] With regard to the outstanding debt of Factory East in the amount of $62,070, an addition to a bad debt reserve of $52,000 was deemed reasonable.[47] And finally, with regard to the $25,000 owed by Orgonics, a reserve addition of $20,000 was considered reasonable by the witness.[48]

Neither the above testimony of plaintiff's tax specialist, nor plaintiff's requested findings of fact make any mention of the $5,000 loan to the partnership Farley-Nixon, nor is that loan included in the computation of a reasonable addition to a reserve for bad debts.[49] That debt is therefore not regarded as being at issue in this case. This case has arisen because the defendant assessed, at zero, a reasonable addition to plaintiff's reserve account for bad debts. That assessment was found on this record

30. *Id.* at 81, 83, 85.

31. *Id.* at 90, 94, 95.

32. *Id.* at 97, 98.

33. *Id.* at 99.

34. *Id.* at 101–104.

35. *Id.* at 106–110.

36. *Id.* at 113–127.

37. *Id.* at 130–138.

38. *Id.* at 141–148.

39. *Id.* at 148.

40. *Id.* at 156.

41. *Id.* at 160–165.

42. The witness is a CPA and partner in the accounting firm of Price Waterhouse.

43. Transcript 173.

44. *Id.*

45. *Id.* at 174.

46. *Id.*

47. *Id.* at 175.

48. *Id.* at 176.

49. *See* and *cf.* footnote 3, CAFC decision of June 28, 1984, note 1, *supra.* As in all tax cases, the actual computations necessary to determine the exact refund to which plaintiff is entitled are best determined by the parties based on a prior determination by this court on the liability issues. It is often necessary, for example, to take into consideration subsequent taxable events having a bearing on adjustment of the taxpayer's returns.

to be arbitrary, unreasonable, and an abuse of discretion, in this court's second decision of June 14, 1983.[50]

In summary, this court has found, and the CAFC has affirmed[51], that plaintiff was engaged in the trade or business of rendering financial consulting services; that the advances to client companies constituted loans giving rise to bona fide debts, rather than contributions to capital; and that plaintiff "had at best a minor equity interest in the client companies."

These findings go a long way toward determining the remanded issue "regarding the taxpayer's business interest as compared to his equity interest" in making the loans. The evidence of record, above-detailed, indicates that all of the loans were part of a general business plan; that the dominant motive for the loans was to advance plaintiff's business as a financial consultant; and that they were not gifts, nor contributions to capital, nor were they to protect any minor equity interest plaintiff might have had in the debtors. It follows that the loans qualified for treatment as business bad debts under Section 166 of the Code; that use of the reserve method under subdivision (c) of that section was appropriate; and that the amount added to a reserve for bad debts under that method was reasonable.

On this record, any contrary conclusions would be clearly erroneous.[52]

---

50. *See Adelson II,* 2 Cl.Ct. 591 (1983).

51. *Adelson v. U.S.,* 737 F.2d 1569 (1984).

52. *See* and *cf. Milmark Services, Inc. v. U.S.,* 731 F.2d 855, 857 (Fed.Cir.1984).