Sheldon G. **ADELSON** and Sandra Adelson, Appellees,

v.

The **UNITED STATES**, Appellant.

Appeal No. 85–2033.

United States Court of Appeals, Federal Circuit.

Jan. 29, 1986.

Francis Allegra, Tax Div., Dept. of Justice, Washington, D.C., argued for appellant. With him on the brief were Glenn L. Archer, Jr., Asst. Atty. Gen., Michael L. Paup and Carleton D. Powell.

Richard J. Innis, Hale and Dorr, Boston, Mass., argued for appellees. With him on the brief were Robert J. Richard, Peter M.C. Golemme and Barry C. Klickstein, Forman, Roberts, Klickstein and Levy, of Boston, Mass.

Before SMITH, Circuit Judge, SKELTON, Senior Circuit Judge, and BISSELL, Circuit Judge.

BISSELL, Circuit Judge.

The government appeals, for the second time, from a decision of the United States Claims Court (Spector, J.) deciding that Sheldon G. Adelson and Sandra Adelson (referred to jointly as Adelson or taxpayer) are entitled to a refund of $163,506.16, plus interest, based on what the court determined was a reasonable addition to a bad debt reserve under I.R.C. § 166(c) (1982) *.

---

* The decisions in this case discussing the complete factual background and procedural history

In this court's decision to the government's first appeal (Adelson I), we affirmed the holding of the Claims Court that taxpayer's advances to the client-companies were bona fide debts, 737 F.2d at 1573, and vacated and remanded for additional factual findings to support an objective analysis under *United States v. Generes*, 405 U.S. 93, 92 S.Ct. 827, 31 L.Ed.2d 62 (1972), in determining the "dominant motivation" of the taxpayer in making the loans. 737 F.2d 1574–75. We again vacate and remand.

## BACKGROUND

Taxpayer's income tax return for 1969 reflected a net operating loss of $355,-467.10 incurred in his trade or business. On March 2, 1971, he filed an amended return for 1968, claiming a refund of $189,-493 by reason of a carryback from 1969. All but $25,986.84 of the claimed refund was disallowed by the Internal Revenue Service, resulting in this refund suit for the balance of $163,506.16.

In 1969, taxpayer was engaged in the business of providing financial consulting services to clients for a fee. His clients consisted of new, growth-oriented companies which planned eventually to go public but lacked the business experience to do so without the assistance of a professional financial consultant.

After acceptance of a client, taxpayer would arrange for the borrowing of the necessary funds to begin financing the company's growth. In many cases the client-companies would be unable to obtain financing from traditional sources due to their lack of collateral or speculative nature. Taxpayer would in these cases lend the client the necessary funds himself, either out of his own capital or out of funds he would personally borrow. The borrowed funds were loaned to the client at about the same interest rates which taxpayer was paying to the lending institution. These advances to the client-companies

were in exchange for an agreement by the client to retain taxpayer as a financial consultant on a longer-term basis than may have been originally contemplated. The arrangement ordinarily remained in effect indefinitely and until mutually discontinued. In exchange for his consultant services, taxpayer would bargain for and receive a monthly fee of from $500–$1,500. On occasion, taxpayer would alternatively receive compensation in the form of stock or warrants of the client-company.

Taxpayer made at least seven short-term (3–6 months) loans to the client-companies during 1968 and 1969, and these loans remained unpaid in whole or in part at the end of 1969. The unpaid loans were generally unsecured, it being the expectation of both the lender and the borrower that repayment would be made from the proceeds of public offerings planned within the period of the loan, or within a renewal period of equally short duration.

In May of 1969, "Black Tuesday" descended upon the stock market, and particularly the new issues market. Several of the companies to which taxpayer had extended loans in anticipation of imminent and successful public offerings eventually became insolvent. Faced with this state of affairs, taxpayer elected the reserve method of reporting business bad debts on his 1969 return. In an amended petition in the Claims Court, he claimed an addition to his bad debt reserve in the amount of $222,500, based on outstanding loan balances totaling about $271,265.

## OPINION

In *Adelson I* we stated that effective review is not possible:

in the absence of any factual findings or discussion regarding the benefits that might have inured to taxpayer's business interest (actual or *potential* income from consulting fees) as compared to his equity interest in the client-companies (e.g.,

appear at: *Adelson v. United States,* 553 F.Supp. 1082, 1 Cl.Ct. 61 (1982), *vacated,* 2 Cl.Ct. 591 (1983), *aff'd in part and vacated in part,* 737

F.2d 1569 (Fed.Cir.1984) (*Adelson I*), *on remand,* 6 Cl.Ct. 102 (1984).

stock, options, warrants). We emphasize that the determination of dominant motivation need not depend on a "mathematical analysis" whereby the investment in or *potential reward* to each interest is tallied up, with the larger figure conclusively establishing which interest was dominant.

737 F.2d at 1574 (emphasis added).

On remand the Claims Court reviewed the original record and stated findings dealing with the initial business and equity interests in the client-companies. The Claims Court then summarized, without making findings as to the potential reward of each interest, that Adelson

> was engaged in the trade or business of rendering financial consulting services; that the advances to client companies constituted loans giving rise to bona fide debts, rather than contributions to capital; and that plaintiff "had at best a minor equity interest in the client companies."

*Adelson,* 6 Cl.Ct. at 109.

The Claims Court continues:

> These findings go a long way toward determining the remanded issue "regarding the taxpayer's business interest as compared to his equity interest" in making the loans. The evidence of record, above-detailed, indicates that all of the loans were part of a general business plan; that the dominant motive for the loans was to advance plaintiff's business as a financial consultant; and that they were not gifts, nor contributions to capital, nor were they to protect any minor equity interest plaintiff might have had in the debtors. It follows that the loans qualified for treatment as business bad debts under Section 166 of the Code; that use of the reserve method under subdivision (c) of that section was appropriate; and that the amount added to a reserve for bad debts under that method was reasonable.

*Id.*

No discussion of Adelson's potential for realizing profit from his equity interest was made; nor was any comparison made of this potential profit to the potential profit from Adelson's consulting contracts. Rather than making specific findings regarding the benefits that might have inured to taxpayer's business interest as compared to taxpayer's equity interest, the Claims Court merely reaffirmed its prior conclusion concerning the business nature of Adelson's debts based upon the fact that taxpayer had at best a minor equity interest in the client-companies. This court affirmed in *Adelson I* the conclusion that taxpayer's advances were bona fide debts. However, if a conclusion that the advances were bona fide debts was a sufficient factual finding for the *Generes* analysis, this case would not have been remanded for additional factual findings concerning taxpayer's dominant motivation for extending the loans.

In remanding *Adelson I* for additional findings of fact, no limitation was placed on the Claims Court regarding whether the record could be reopened for additional receipt of evidence. Whether a trial court opens the proceedings on remand is a matter for its sound discretion. *Pittsburgh Press Club v. United States,* 579 F.2d 751 (3d Cir.1978), *on remand,* 462 F.Supp. 322 (W.D.Pa.1978), *rev'd,* 615 F.2d 600 (3d Cir. 1980); *cf. Seminole Indians v. United States,* 455 F.2d 539, 541 (Ct.Cl.1972). Here, however, the proceedings were not reopened. Any additional findings were deduced from that evidence already produced and admitted into the trial record.

Once again we must remand this case to the Claims Court so that the findings requested in our first opinion may be made. The Claims Court on remand may exercise its discretion and reopen the record. The judgment of the Claims Court is vacated and remanded for further proceedings consistent with this opinion and our opinion reported at 737 F.2d 1569.

Because we remand this case for additional findings, consideration of the remaining issues raised on appeal would be premature.

VACATED AND REMANDED.