Sheldon G. ADELSON and Sandra Adelson, Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 112–76.

United States Claims Court.

April 20, 1987.

**232**

Barry C. Klickstein, Boston, Mass., attorney for plaintiffs. Richard J. Innis, of counsel.

Ellen C. Specker, with whom were Asst. Atty. Gen. Roger M. Olsen and Mildred L. Seidman, Washington, D.C., for defendant.

## OPINION

BRUGGINK, Judge.

At issue in this action is whether taxpayer may deduct certain bad debts pursuant to § 166 of the Internal Revenue Code, 26 U.S.C. § 166. This matter has generated five previously reported decisions. For convenience they will be referred to as follows:

*Adelson v. United States*, (Adelson I) 1 Cl.Ct. 61, 553 F.Supp. 1082 (1982)

*Adelson v. United States*, (Adelson II) 2 Cl.Ct. 591 (1983)

*Adelson v. United States*, (Adelson III) 737 F.2d 1569 (Fed.Cir.1984)

*Adelson v. United States*, (Adelson IV) 6 Cl.Ct. 102 (1984)

*Adelson v. United States*, (Adelson V) 782 F.2d 1010 (Fed.Cir.1986)

In *Adelson I,* this court (Spector, J.) held that Sheldon G. Adelson ("taxpayer")[1] made advances to seven client-companies which were bona fide debts, not capital contributions, and that his dominant motivation in creating the loans was to further his trade or business of financial consultation. The court, however, remanded the case to the Secretary of the Treasury for a determination of the reasonableness of taxpayer's proposed addition to a bad debt reserve. *Id.* 1 Cl.Ct. at 68–79, 553 F.Supp. 1082. Defendant opposed the remand, arguing, *inter alia,* that the Secretary had already determined that no deduction was permitted under § 166(a) because taxpayer had not established that the advances were wholly or partially worthless at the close of 1969. In *Adelson II,* the court held that remand was not necessary, that the government's method of determining a zero addition to a bad debt reserve was arbitrary, unreasonable, and an abuse of discretion, and thus taxpayer was entitled to his claimed refund. 2 Cl.Ct. at 596. On a secondary issue, the court implicitly rejected the government's disallowance of a business expense deduction for interest paid on amounts used as advances to the client-companies.

Defendant appealed *Adelson II.* In its decision, the Court of Appeals for the Federal Circuit in *Adelson III* affirmed the holding of this court that taxpayer's advances to the client-companies were bona fide debts, 737 F.2d at 1573, but vacated and remanded for additional factual find-

---

1. Sandra Adelson is a party solely by reason of the filing of joint returns for the years in question.

ings to support an analysis under *United States v. Generes,* 405 U.S. 93, 92 S.Ct. 827, 31 L.Ed.2d 62 (1972), to determine the "dominant motivation" of the taxpayer in making the loans. 737 F.2d 1574–75. On remand, this court (Spector, J.) held in *Adelson IV* that taxpayer was entitled to a refund of $163,506.16, plus interest, after once again concluding that taxpayer's dominant motivation in making the loans in question was to further his trade or business, and that the addition to a bad debt reserve was reasonable under § 166(c).

Defendant appealed and in *Adelson V,* the court of appeals once again remanded the case for further findings pursuant to *Generes.* The judgment was vacated with the suggestion that the "Claims Court on remand may exercise its discretion and re-open the record." 782 F.2d at 1012.

Upon remand the court requested the parties to advise what further proceedings they believed were required. Plaintiff did not respond. Defendant took the position that the record was adequate but suggested additional briefing, which was allowed. On August 19, 1986, the action was assigned to the present judge. Oral argument was heard, at which time the parties again declined an offer to reopen the record. In light of issues raised at oral argument, the parties were afforded another opportunity to later request reopening and to respond to certain points raised during argument. The court also advised the parties that if upon review of the record the court felt further evidence was necessary, the record would be reopened on a limited basis. Both parties have subsequently fully briefed their positions and iterated their view that the record was adequate. Upon review of the record, the previous decisions, and the submissions on the current remand, the court finds that the analysis directed by the court of appeals in *Adelson III* and *V* can be done without reopening the record.

### I. *General Factual Background*

The decision in *Adelson IV* was vacated, and thus, to the extent findings and conclusions there were not adopted by the appellate court, they are not binding in the present decision. Many of the findings and conclusions were adopted, however, and will be relied upon. Based on those findings as supplemented by the court's own review, the background facts are as follows.

In 1968 and 1969, taxpayer was primarily engaged in the business of providing financial consulting services to clients for a fee. His clients consisted of new, growth-oriented companies which planned eventually to go public but lacked the business experience to do so without the assistance of a professional financial consultant. In exchange for his consultant services, taxpayer would bargain for and receive a monthly fee. On occasion, taxpayer would receive alternate compensation in the form of stocks or warrants in the client-company.

After acceptance of a client, taxpayer would arrange for the borrowing of the necessary funds to begin financing the company's growth. In many cases the client-companies would be unable to obtain financing from traditional sources due to their lack of collateral or due to their speculative nature. Taxpayer would in these cases lend the client the necessary funds himself, either out of his own capital or out of funds he would personally borrow. The borrowed funds were loaned to the client at roughly the same bank interest rates which he was paying to the lending institution. Although there was some periodic variation in the amounts taxpayer was paying as opposed to what he was charging, the differences were minimal.

Prior to this period, taxpayer's business had primarily been that of a mortgage broker. This aspect of his trade had diminished, however, and during the period in question was substantially less than the activities described above.

Taxpayer contends that in making advances to client-companies, he would obtain an agreement to continue to retain taxpayer as a consultant on a longer-term basis than may have been originally contemplated. This arrangement would remain in effect until mutually discontinued. While there is no specific evidence of this practice with regard to companies other than the

ones involved in the loans at issue, there was generalized, but uncontradicted testimony to support this scenario, and it was in any event not challenged on appeal and was recited as background in *Adelson III*, 737 F.2d at 1570–71, and *Adelson V*, 782 F.2d at 1011.

In his complaint, taxpayer sought approval of an addition to a bad debt reserve under § 166(c) with respect to monies extended to seven companies. Taxpayer made these loans or series of loans during 1968 and 1969 and they remained unpaid in whole or in part at the end of 1969. They were all intended to be short-term bridge loans, and were unsecured. It was taxpayer's expectation that repayment would be made from the proceeds of public offerings planned within the period of the loan, or within a renewal period of equally short duration.

Because of dramatic changes in the market for all equity securities beginning in May 1969, and particularly with respect to new issues by emerging companies, the ability of taxpayer's client-companies to get financing through sale of equity securities was severely affected. Several of the companies to which taxpayer had extended loans in anticipation of imminent and successful public offerings eventually became insolvent. Faced with this state of affairs, taxpayer elected the reserve method of reporting business bad debts on his 1969 return. In his amended petition, he claims, exclusive of the loan to Farley-Nixon,[2] an addition to his bad debt reserve in the amount of $217,500.00, based on outstanding loan balances totaling about $266,275.00.

Taxpayer's income tax return for 1969 reflected a net operating loss of $355,467.10 incurred in his trade or business. This figure is composed of two sums disputed here—the amount, if any, to be included in a bad debt reserve, and interest in

the amount of $41,504.10 which taxpayer claims on "business debts." On March 2, 1971, he filed an amended return for 1968, claiming a refund of $189,493.00 by reason of a carryback from 1969. All but $25,986.84 of the claimed refund was disallowed by the Internal Revenue Service, resulting in this refund suit for the balance of $163,506.16.

## II. *Applicable Law*

The deductibility of bad debts is controlled by § 166. The general rule that a taxpayer may deduct any debt which becomes worthless within the taxable year is limited as to individual taxpayers by paragraph (d), which provides that nonbusiness bad debts are to be treated the same as losses on the sale or exchange of short-term capital assets. It goes on to define a nonbusiness bad debt as one other than a debt "created or acquired (as the case may be) in connection with a trade or business of the taxpayer." I.R.C. § 166(d)(2). The relevant regulations amplify that section:

[W]hether a debt is a nonbusiness debt is a question of fact in each particular case. ... For purposes of subparagraph (2) of this paragraph, the character of the debt is to be determined by the relation which the loss resulting from the debt's becoming worthless bears to the trade or business of a taxpayer. If that relation is a proximate one in the conduct of the trade or business in which the taxpayer is engaged at the time the debt becomes worthless, the debt comes within the exception provided by that subparagraph.

26 C.F.R. § 1.166–5 (1969).

Inevitably, situations arise in which a taxpayer has both business and nonbusiness interests in mind in making a loan. In such circumstances, it is the role of the court to identify and weigh those respective interests in light of the particular facts, and, as meaningfully as possible, to make an objective judgment as to which

---

**2.** The $5,000.00 loan to Farley-Nixon is no longer at issue. The decision in Adelson IV found that neither the testimony nor proposed findings of fact address that loan, and taxpayer conceded it is not in issue in his brief of December 12, 1986. Disregarding the loan to that company does not affect the financial relief

taxpayer seeks. As defendant points out in its brief of December 12, 1986, although taxpayer's claimed bad debt reserve would be reduced from $222,500.00 to $217,500.00, the net operating loss carryover ($323,719.10) from 1967 to 1968, the year in issue, is still in excess of taxable income for 1968 ($312,830.00).

predominates, bearing in mind that the burden of proof lies with the taxpayer.

The *Generes* decision is the most significant one describing this analytical process. The taxpayer in *Generes* owned 44% of the outstanding capital stock of a closely held corporation engaged in construction. His investment in the stock was $38,900.00. His business associate owned another 44%. Generes was president of the company and earned a $12,000.00 salary, although his work took no more than 8 hours per week from his other full-time job, from which he earned a $19,000.00 salary. Earnings from other sources lead to a total annual income of $40,000.00. Because of financial difficulties Generes made approximately $320,-000.00 in guarantees for and loans to the company. The company became insolvent and Generes was called on to honor his indemnification agreement and lost $162,-000.00. He subsequently sought to deduct that amount as a bad debt.

In reversing the two lower courts, the Supreme Court enunciated a standard for reviewing such transactions. It concluded that the dominant motivation must be the business interest. It is not enough that it is merely a significant motivation. Rather than remanding, the Court found that the only evidence to support the taxpayer's position was his "self serving" statement that he wished to protect his $12,000.00 salary by making the guarantees. The Court found this unpersuasive in light of the size of his original investment (which had a minimum value of $38,900.00), the extent of his outstanding loans to the company, and his personal interest in preserving the business for his family. The weak position of his salary interest suffered even further since it was a pre-tax figure, whereas his $38,900.00 investment was taxpaid.

In view of *Generes*, the primary issue remaining in determining the validity of the additions to taxpayer's bad debt reserve is that of his motivation in making the six loans in question. The subjective evidence,

relied upon heavily in the earlier trial decisions in this issue, plainly supports taxpayer's position. However, the test of *Generes* focuses by nature on objective evidence of the particular circumstances of a given loan. In the case at bar some of the evidence is applicable to all the loans. In other respects, the loans have to be viewed separately. Taxpayer's involvement with the six companies in question will, therefore, be separately scrutinized. It is conceivable, and in fact the court hereafter finds, that the proof varies by company and leads to different results. Nevertheless much of the analysis with respect to the first company discussed, Continental Travel, will be applicable to the five other loans as well.

At the outset, four general points can be made with respect to all six companies, and in reaching individual results the court has taken them into consideration. First, although the ideal beginning place for assessing the relative weight of taxpayer's interests in making loans would be the sources of his income for the year in question, the parties have not facilitated that type of analysis here. Taxpayer received no salary during 1969. He did however receive approximately $17,000.00 in gross receipts from his "finance" business, and about $62,000.00 from his consultant business. In addition, if taxpayer had in fact received all the consultant income he anticipated from the companies in question here, he would have earned over $70,000.00 per year. Although the size of that actual and potential consulting income tends to support taxpayer's argument,[3] reliance on those figures is tenuous at best. The largest portion came from one transaction in which taxpayer received $200,000.00 payable over three years for services as a development consultant and mortgage broker. Apparently very little of taxpayer's 1969 income came from the businesses to which the loans in question were made. Moreover, taxpayer's returns for previous

---

**3.** Unlike the situation in *Holland v. Commissioner,* 728 F.2d 360 (6th Cir.1984), for example, where taxpayer had never actually received his theoretical salary, or *Hodgson v. Commissioner,* 48 T.C.M. (PH) 21, 23 (1979), where taxpayer

merely had a hope of future employment. Taxpayer's situation is more comparable to *Gilboy v. Commissioner,* 37 T.C.M. (C.C.H.) 510 (1978), where the Court found credible taxpayer's expectation of future sales commissions.

years reflect that he had earned substantial amounts of money on sales of securities. In sum, this evidence is equivocal and merely tends to demonstrate the need to do a company-by-company analysis.

The second general point concerns the legislative intent behind § 166. In his concurring opinion in *Generes*, Justice Marshall states that the "major congressional purpose in distinguishing between business and nonbusiness bad debt was to prevent taxpayers from lending to friends or relatives who they knew would not repay it." 405 U.S. at 110, 92 S.Ct. at 836. In support he points to legislative history reflecting this concern. H.R.Rep. No. 2333, 77th Cong., 2d Sess., 45, 76–77; S.Rep. No. 1631, 77th Cong., 2d Sess., 90. For example, the report of the House Committee on Ways and Means, H.R.Rep. No. 2333 at 45, contains the following explanation of the 1942 change which disallowed the deduction for nonbusiness bad debt for individuals:

### C.  NONBUSINESS BAD DEBTS

The present law gives the same tax treatment to bad debts incurred in nonbusiness transactions as it allows to business bad debts. An example of a nonbusiness bad debt would be an unrepaid loan to a friend or relative, while business bad debts arise in the course of the taxpayer's trade or business. This liberal allowance for nonbusiness bad debts has suffered considerable abuse through taxpayers making loans which they do not expect to be repaid. This practice is particularly prevalent in the case of loans to persons with respect to whom the taxpayer is not entitled to a credit for dependents.

The majority in *Generes* expresses a similar view of the purpose of § 166 when it writes that the "dominant motivation" test strengthens the mandate of § 262 of the Code that no deduction shall be allowed for personal or family expenses. 405 U.S. at 105, 92 S.Ct. at 834.

The particular Congressional concern against intrafamily "loans" was clearly implicated by the circumstances in *Generes*. The corporation there was a closely held family business in which taxpayer owned a 44% interest. His son and a son-in-law owned another 12%. The same cannot be said of the six loans here. With the exception of the loans to Factory East, taxpayer was operating as an outsider. He held relatively small amounts of stock in the companies, and there is no suggestion here that there were non-economic concerns such as maintaining a business for a new generation. This absence of the "personal" interest factor weighs somewhat in taxpayer's favor. *Cf. Winn v. United States*, 2 Cl.Ct. 82, 91 (1983) (concern that business succeed for son's sake reinforced nonbusiness motivation).

Third, taxpayer here spent most of his working time on his consulting business. He testified that although he still did some mortgage brokering, he worked more than 40 hours per week on his financial consulting business. This distinguishes plaintiff from the taxpayer in *Generes* who was in effect a passive investor, working only 6–8 hours per week.

These latter two circumstances are factors favorable to taxpayer which are generally applicable to all the loans. In addition, taxpayer's testimony can be credited to a degree by a background of other corroborating evidence of an overall plan to generate a steady, sizeable flow of income from consulting arrangements.

A final common factor generally strengthens defendant's argument, however. Taxpayer testified that he did not get involved with companies unless they would eventually go public because such companies offered growth opportunities. At a minimum this suggests an omnipresent motive was the possibility of substantial gains on small equity investments.

### III.  *Discussion*

#### A.  Continental Travel

##### 1.  Fact Findings

Plaintiff had developed a reputation for a certain expertise in understanding the financial aspects of the travel industry. As a result he became involved in the merger of two small travel agencies, Continental

Travel Inc. ("CTI") and Imperial Travel, Inc. ("Imperial"). Prior to the June 4, 1968 merger, taxpayer had purchased 21,167 shares of Imperial for $21,167.00. In addition, taxpayer acquired as a finder's fee stock in both predecessor corporations. The corporation that came out of the merger was Continental Travel, Ltd. ("CTL"). Subsequent to the merger, plaintiff exchanged his shares of CTI and Imperial for 233 shares of preferred stock and 23,141 shares of common stock of CTL.

Taxpayer testified that after the merger he "had an agreement" with CTL to be a financial consultant, primarily in connection with the subsequent public offering. He was unable to recall how much he received. The existence of such an arrangement was confirmed by Thomas Fallon, at that time Executive Vice-President of CTL. At the time of and in exchange for the original loan in October 1968, it is taxpayer's testimony that the three principals in CTL agreed that he would remain a consultant for CTL for a monthly fee of "$1,000.00 or $1,500.00."

Plaintiff became a director of CTL on October 15, 1968. On that same day, John A. McNiff (chairman of the board), Fallon and taxpayer advanced to CTL the sum of $200,000.00 for a period of 60 days at 6% interest. The advance was not evidenced by a promissory note. Of the $200,000.00 advanced, taxpayer, Fallon, and McNiff borrowed jointly $59,995.00, and taxpayer borrowed individually $59,995.00. These bank loans were for a period of six months and bore interest at 7½ percent. It was anticipated that the loans would be repaid out of a public offering. Thus, the total amount taxpayer loaned to CTL was $66,-700.00. At that time, his equity position in the company consisted of 23,141 shares of common and 233 shares of preferred stock, representing respectively approximately 1.5% and 5% of outstanding shares.

On December 15, 1968, the due date of the $200,000.00 loan to CTL was extended sixty days. Later in December, taxpayer, McNiff, and Fallon were required by CTL to convert their advances into 6 percent three-year convertible notes, due October 14, 1971. This was prompted by CTL's desire to make the impending public offering more attractive by minimizing short-term debts which had to be reflected in the offering circular. At the option of the holder, the notes were convertible into shares of common stock of CTL at a rate of $5.00 per share.

Although the record is not clear as to the date, taxpayer also purchased 13,333 common stock purchase warrants for $133.33, apparently contemporaneously with the conversion to convertible notes. Each warrant evidenced the right of the holder to purchase one share of common stock at $10.00 per share during the five-year period commencing with the date of the convertible note.

CTL had total stockholders' equity (deficit) as of the following dates in the amounts indicated:

| Date | Amount |
|---|---|
| May 31, 1968 | $197,102 |
| September 30, 1968 | (94,297) |
| December 31, 1968 | (398,710) |

As of December 31, 1968, CTL had total current assets of $1,175,668 and total current liabilities of $1,383,260.

A public offering of 350,000 shares of CTL at a price of $12.00 per share became effective in February 1969. The prospectus reflects that at the time of the offering, the book deficit applicable to common stock was $1.92 per share, and that after completion of the offering, preferred stock would have a preferential right in case of liquidation to $447,300.00 contributed by public investors. As a result, the book value of common stock would be only $3.78 per share, and the public investors would incur an immediate dilution of $8.22 per share.

CTL had considerable losses in 1969 and lost all its capital by 1970. Although taxpayer reported interest income of $4,160.00 in 1969 on loans to CTL, none of the principal of $66,700.00 was ever repaid. Taxpayer's return for 1969 does reflect, however, that he was able to sell some of the CTL stock he purchased in August 1968 at a gain of $10,742.00.

### 2. Application

■ As of October 1968, the following factors can be counted toward taxpayer's business interest. He had a consulting arrangement with CTL which arose from the merger, under which he would receive $1,000.00 to $1,500.00 per month for an indefinite period. In making the loan he obtained an agreement to continue this arrangement. The precise value to give this and similar agreements taxpayer had with other companies is difficult. The arrangement could have ended the first month, or it could have lasted several years, and as taxpayer hoped, could have gone to increasingly higher amounts. For lack of any meaningful way to measure the term of such an arrangement, however, the court adopts the view that it is reasonable to place a one year life expectancy on an indefinite term agreement. Any term significantly beyond that would in any event have to be discounted to a present value. It would not be appropriate to assume no length to the agreement at all, however, because the court finds that the taxpayer and others genuinely anticipated a successful public issue which would solidify the consulting agreement. On the assumption that the agreement with CTL would last one year, taxpayer would be able to rely on an annual pretax income from this one client alone of $12–18,000.00 per year.[4]

Close scrutiny suggests that the weight to be given to the taxpayer's expectation should be discounted, however. Taxpayer's consulting arrangement and the theoretical arrearages generated under it are not mentioned in the February 1969 offering circular. That circular lists the various equitable interests of taxpayer, as well as his loans to the company, and his payment for services in connection with the merger. In the section describing the Board of Directors, taxpayer is referred to as "President of S.G. Adelson and Company, Boston, a financial consulting firm. Through this

firm and its predecessors, he has been acting as an independent financial consultant since 1969." Particularly since taxpayer played a critical role in organizing the offering, the failure to mention taxpayer's role as an ongoing consultant is significant. Moreover, in the section outlining remuneration of directors and officers, Adelson is not mentioned. In explaining the "Interest of Management and Others in Certain Transactions," mention is made of obligations to pay legal fees, insurance premiums and other obligations, but Adelson's agreement to do consulting at $12–18,000.00 per year is conspicuous by its absence. In addition, the fact that taxpayer could not clearly remember the amount of monthly compensation, or that it was fluid in the minds of the parties suggests that it was less of a factor to taxpayer. These considerations do not mean that there was no agreement. They merely reflect on the relative lack of importance which can objectively be attached to the agreement.

Taxpayer's equity interest in CTL in October 1968 was by comparison more significant. He held 23,141 shares of common stock and 233 of preferred, which represent a cash investment of $21,167.00 in after-tax dollars. While some of the stock in CTL represents a finders fee for taxpayer's assistance in the merger, that circumstance does not diminish their weight as an equity interest with potential value. It merely means that as to those shares he did not have the additional concern of capital at risk. Although CTL stock had a negative value in late 1968 it was presumed at the time of the loans or shortly thereafter that the public offering would give it positive worth. The book value of common stock upon issuance was to go from a deficit of $1.92 per share to a positive value of $3.78. Although the company failed, it was thus poised in late 1968 to give taxpayer a significant return on his cash investment if it succeeded. His stock, at $3.78 per share,

---

**4.** The court rejects defendant's argument that since taxpayer entered into a consulting arrangement with CTL immediately after the merger, and before the loans, there was no relationship between the loan and the consulting agreement. While it would be helpful to taxpayer's argument if the consulting arrangement originated in the loans, the fact that it pre-existed is by no means fatal. Taxpayer testified that the *continuation* of the arrangement was a condition for the loans.

would have been worth over $87,000.00, for which he had risked $21,167.00.[5]

Although the court would count taxpayer's stock ownership toward his nonbusiness interest regardless of whether it was obtained as a gift or for cash, the court gives additional weight to a stock interest depending on how it was obtained. Stock obtained in exchange for work represents an investment of time and effort, and creates an additional interest in protecting that investment which is not present when stock is received gratuitously. However, while an equitable interest received in exchange for labor can be a significant motivator depending on the potential of the company, that labor is not "at risk." When stock is obtained through cash or enforceable borrowings, then a further and even greater interest arises—the desire to protect money at risk.

■ Here the equity interest is twofold—potential for growth and the risk of losing a substantial after-tax cash investment larger than the pretax value of a one year consulting agreement. The court concludes when this nonbusiness interest is balanced against the possibility of receiving $12–18,000.00 in pretax income, that taxpayer has not, considering all the circumstances, demonstrated a dominant motivation of preserving his business interest in making loans to CTL.

### B. Cutlass Aviation

#### 1. Fact Findings

Cutlass Aviation, Inc. ("Cutlass") was an air delivery service incorporated on March 28, 1969 as a successor to Buker Airways Co. On March 19, 1969, and April 4, 1969, taxpayer advanced $50,000.00 to Buker and then $12,101.00 to Cutlass. The advances,

which were evidenced by promissory notes executed to the order of taxpayer, bore interest at 8¾ percent and were payable on demand. Taxpayer obtained the funds that he advanced by borrowing the entire amount in March and April 1969 from a bank on secured notes. On May 2, 1969 taxpayer purchased 21,000 shares of common stock of Cutlass out of 650,000 shares of common stock outstanding. He paid for the stock by means of a $7,000.00 promissory note payable to Cutlass. The taxpayer could retire this note by surrendering his stock to the corporation at any time. On May 16, 1969 he became a director of Cutlass.

Cutlass repaid taxpayer $8,500.00 in 1969. Plaintiff reported $5,589.00 of this amount as interest income for federal income tax purposes on his 1969 individual income tax return. Plaintiff received no other repayment.

Taxpayer also guaranteed a loan of $100,000.00 to Cutlass from Capitol Bank and Trust Company which bore interest at 9½ percent. Taxpayer paid $3,045.00 on this guarantee on November 19, 1969, and $3,270.00 in 1978.

On December 31, 1968, Cutlass had retained earnings of $11,915.00. On April 30, 1969, Cutlass had a deficit of $88,525.00. On December 31, 1968, and April 30, 1969, Cutlass had paid-in capital of $226,371.00 and capital stock of $60,000.00.

Taxpayer testified that when he made the loans to Cutlass in spring 1969, he entered into an agreement to be a financial consultant for a monthly fee of $1,000.00. There is no written evidence that plaintiff received any payments. The former president of Cutless testified, however, that Adelson was "a financial consultant." In the absence of any evidence to the con-

---

**5.** In reaching its conclusion the court rejects defendant's argument that the warrants taxpayer obtained as a result of restructuring the loans to CTL are additional proof that his motivation was not to protect his business. Taxpayer will not be penalized for events that were not anticipated at the time of the loans. The relevant inquiry is the character of taxpayer's motivation

contemporaneous with the time the loans were made. The evidence supports a finding that the loan restructuring was done later and against taxpayer's wishes. In the absence of a supportable allegation that the novation was voluntary, and that it thus becomes the relevant point of inquiry, the court does not consider the war-

trary,[6] the court finds that there was an agreement by Cutlass to employ taxpayer if the company succeeded in a public sale.

### 2. Application

Taxpayer had a financial consulting arrangement from which he stood to gain $1,000.00 per month in pretax income for an indeterminate period. Defendant argues that its contingent nature undercuts the weight to be given the consulting agreement. That does not advance defendant's argument, however, since the same thing can be said of a return on equity investments. The fact is that taxpayer loaned Cutlass $62,101.00 at the same time that he had a consulting arrangement with it. *See supra* note 3.

Defendant proposes to place $157,000.00 on the nonbusiness side of the scales. It draws this amount from the $7,000.00 taxpayer paid for his stock, the loan guarantee of $100,000.00 and the $50,000.00 loan of March 19. The court disagrees with most of defendant's calculus. The court will exclude from the *equity* interest the very loans at issue. The question is why those advances were made in the first instance. That analysis has to be from a pre-loan vantage. Stating the obvious that these amounts are at risk once loaned does not advance the determination of what reasoning went into making the loan in the first instance. Although defendant cites *Generes*, 405 U.S. at 106, 92 S.Ct. at 834, as contrary to this view, it is not. The taxpayer there had made loans and executed guarantees. When the corporations went under, *he took the loans as a nonbusiness bad debt.* It was only the indemnification loss which he sought to deduct under § 166. Thus, the court's addition of his loans to the corporation to the "equity side" merely reflects what the taxpayer in that case had already admitted—that they were nonbusiness loans.

▆ Defendant is correct, however, in pointing to the ratio of the loan compared

to the salary/fee expectancy. It would strain credulity to argue that a very large loan was advanced to protect a very small salary interest. It would not make business sense. A high ratio would suggest the presence of a different motive. *Compare Liebmann v. Commissioner*, 48 T.C.M. (PH) 1549 (1979), *aff'd*, 630 F.2d 654 (8th Cir.1980) ($459,000.00 in loans overwhelmed salary ranging between $5,600.00 and $14,400.00); *Orrell v. Commissioner*, 48 T.C.M. (PH) 545 (1979) ($113,000 in loans held not advanced to protect $19,000 salary); and *Davenport v. Commissioner*, 70 T.C. 922, 933 (1978) (not credible that taxpayer would spend $130,000.00 on stock and loans to protect $7,200.00 in pre-tax income) *with Carter v. Commissioner*, 48 T.C.M. (PH) 1754 (1979) ($10,000.00 in loans motivated by desire to protect minimum of $18,000.00 in income); and *Haslan v. Commissioner* 43 T.C.M. 448 (PH) (1974) ($100,-000.00 guarantee held to be motivated by desire to protect $20,000.00 salary). In this case, the court concludes that the $50,-000.00 loan, which taxpayer anticipated getting back, is not so disproportionate to the $12,000.00 in pre-tax income he anticipated receiving in the first year, as to warrant, by itself, rejection of taxpayer's position.

A separate question arises with respect to the $100,000 guarantee on which taxpayer eventually paid approximately $6,300. Although the existence of a guarantee might otherwise be a factor to weigh here, there is no evidence that the guarantee predated the loans, and thus no evidence that it could have been a relevant factor for taxpayer in advancing the monies.

One significant circumstance with respect to the stock purchase is that it took place after the loans. Although the court finds in connection with the loan to Orgonics that a period of less than a month made the loan/consulting agreement contemporaneous, there the time period involved was smaller and taxpayer testified that the loan

---

6. rants as adding to a nonbusiness motivation in October 1968.

6. Although the evidence was less than overwhelming, defendant put on no witnesses during trial and did not cross examine Adelson or the former president on this point.

and consulting were interdependent. Here the time separation was greater and there is obviously no comparable testimony to support defendant. This hiatus weakens defendant's argument that the loans were made with an equity interest in mind. In addition, although taxpayer obligated himself to pay $7,000.00 for his stock, no money was actually transferred. Rather, the note he signed could be extinguished by turning in the stock. The court thus assigns very little weight to the "risk factor." Defendant also points to the prospectus which states that upon a successful public offering certain individuals who had bought shares earlier for $ .33 to $2.00 per share would reap "substantial profits." Taxpayer however was not in that group. He paid $3.00 per share. There is no evidence as to what the anticipated offering price would be since the sale fell through. There is no proof that it would be substantially in excess of $3.00 per share.

In sum, taxpayer advanced the loan at a time when he anticipated receiving $12,000.00 per year in pretax income and when he had no equity investment or ownership. The loan size has been found not to overcome this evidence. The court concludes that on this set of facts, plaintiff has shown that his dominant motivation was his financial consulting agreement.

## C. E.B.V. Systems

### 1. Fact Findings

E.B.V. Systems, Inc. (E.B.V.) was incorporated in Maryland on November 19, 1968 and was engaged in the business of developing and manufacturing a ball-type valve. Plaintiff owned 20,000 shares of E.B.V. out of 566,670 shares of common stock outstanding in 1968. He purchased the shares for $106.00 in September 1968 and sold them for $10,650.00 in 1971.

Plaintiff advanced $115,000.00 to E.B.V. between September 11, 1968 and May 2, 1969. Plaintiff obtained a line of credit of $125,000.00 from Industrial Bank and Trust Company, secured by notes and stocks, bearing interest of 10 percent, to acquire the funds he subsequently advanced to E.B.V.

E.B.V. executed four short term promissory notes to the order of plaintiff between September 13, 1968 and March 19, 1969. They totalled $110,000.00 and bore interest ranging between 6 and 9 percent. Prior to July 12, 1969, E.B.V. repaid $96,000.00, and taxpayer received $2,072.00 in 1969 as interest on the amounts he advanced. He received no other interest or cash repayments.

Taxpayer submitted a signed memorandum agreement between him and E.B.V., dated September 19, 1968, which memorialized their understanding that taxpayer would loan $45,000.00 in addition to the $15,000.00 already advanced at that time, in exchange for which E.B.V. would pay him $1,000.00 per month for financial advisory services until the agreement was mutually discontinued. Taxpayer received only $350.00 pursuant to that agreement.

For the period of February 9, 1968, to September 30, 1968, E.B.V. had a net loss from operations of $48,693.00, a deficit of $57,397.00, and a stockholders' deficit of $54,397.00.

Between February and August 1969, taxpayer unconditionally guaranteed loans of $417,000.00 to E.B.V. In an effort to avert bankruptcy proceedings, in 1971, E.B.V. entered into a financing program with a Rhode Island corporation pursuant to which (1) E.B.V. would be loaned $45,000.00 in exchange for a note secured by a mortgage on the company's real estate, (2) the company's contracts and receivables would be financed in accordance with the terms of a standard type factoring agreement, and (3) the lender would purchase a 25 percent interest in the company for approximately $5,000.00, on the condition that outstanding notes payable be capitalized. Pursuant to this agreement amounts then due plaintiff were converted to E.B.V. common stock at a rate of $2.00 per share. Plaintiff received 16,500 shares in this conversion, which represented (1) the forced conversion of the balance of $19,000.00 owed on his advances to E.B.V., (2) unpaid interest on the advances in the amount of

$2,533.00, and (3) unpaid consulting fees of $11,000.00.

### 2. Application

At the time taxpayer made the initial loans to E.B.V. he had an expectancy that he would receive $12,000.00 per year in pretax dollars through the consulting arrangement. His "investment" in this amount was the substantial time he spent helping to develop the filings with the Securities and Exchange Commission. Specifically he obtained attorneys, accountants and underwriters; he negotiated with them; and he developed the capitalization proposal. Taxpayer's equity interest during the loan extension period was purchased for $106.00.[7] In December 1968 that interest had a negative value. The offering circular of that same date indicates that the successful sale of 100,000 shares at $3.00 each would result in an appreciation of existing shares to $ .29 each. Thus, in December taxpayer could anticipate an immediate gain of over $5,700.00 on his shares. His risk capital was virtually nil, however.

Although the scales would appear to favor taxpayer's business interest in December 1968, that is not when the loans in question were made. Taxpayer was repaid $45,000.00 of the $70,000.00 in outstanding loans as of December 27. When he made his final loans to the company on March 18 and May 2 totalling $45,000.00, however, he had in the interim guaranteed a $60,000.00 loan to E.B.V. in February. On the principle that payment should be applied to the oldest debt outstanding, when E.B.V. repaid $51,000.00 in July 1969, the $19,000.00 remaining unpaid represented monies lent on March 18 and May 2, i.e., after the $60,000.00 guarantee became a consideration for taxpayer.

█ The court concludes that the potential loss of $60,000.00, when added to the potential minimum gain of $5,700.00 on his 20,000 shares of stock, was of greater motivation in March and May 1969 than was the preservation of his consulting arrangement which had a value of something less than $12,000.00.

### D. Entervolve

#### 1. Fact Findings

Robert Laurence Productions, Inc., was incorporated on March 15, 1968, and was engaged in the business of motion picture production. On July 27, 1969, the name of the corporation was changed to Entervolve, Inc. ("Entervolve").

Taxpayer became involved with the company in order to give it advice in connection with financing its business. It was anticipated that there would be a public offering. In the interim taxpayer agreed on July 11, 1969 to provide a bridge loan of $25,000.00. The loan accrued interest at 9½% and matured on October 10, 1969. Before it matured, taxpayer extended two additional loans on September 30 and October 6, totalling $6,300.00. The terms of these additional loans are not in the record. Of the total of $31,300.00, none was repaid.

Entervolve's former Treasurer, Gerald Aransky, testified that Adelson had a consulting agreement with the company, and a "financial arrangement" pursuant to which taxpayer would raise money for Entervolve as part of his consulting agreement. Taxpayer did not testify concerning this arrangement, and no documentary evidence was introduced. When Aransky was asked about what sort of compensation taxpayer was to receive, he could not recall if a monthly fee was to be paid. Rather, he remembered that taxpayer would earn a finder's fee for all monies raised.

Although the evidence on taxpayer's ownership of stock in Entervolve is less than crisp, there is no question that as of July 11, 1969 he had purchased 10,000 shares at $1.00 each in exchange for a five-year note at 6% interest. This represented 1.9% of the shares outstanding. He could retire the note by giving back the stock.

---

**7.** The court will not consider the 1971 debt to stock conversion as adding to taxpayer's nonbusiness interest in 1968–69. The conversion of

$11,000.00 in unpaid consulting fees does, however, confirm the existence of the consulting agreement.

Entervolve did not make a public offering of stock as anticipated. In order to raise additional monies, however, the company entered into new loans in early 1970. As part of this financing, existing loans such as Adelson's were put on a long term payback. Contemporaneously, Entervolve issued an aggregate of 35,000 shares of its one-cent par value common stock to 17 persons at a price of one-cent per share and in consideration of loans (other than Adelson's) in the aggregate principal amount of $146,000.00.

For the fiscal year ending October 31, 1969, Entervolve had had a profit of $120,452.00. For the fiscal year ending October 31, 1970, Entervolve however had a net loss of $249,283.00. Entervolve had "production held for sale" and "production in process" valued at $313,403.00 and $247,371.00 at October 31, 1969, and October 31, 1970, respectively. Entervolve filed a petition in bankruptcy on April 14, 1972.

### 2. Application

Taxpayer made the comment during testimony that he might have avoided his dispute with defendant if he kept better records. Entervolve illustrates his point nicely. Taxpayer has the burden of proving entitlement to his deduction, yet there was no documentary evidence of his consulting agreement with Entervolve. He did not even testify that there was an arrangement to loan money in exchange for preserving his financial consultant position with the company. Although Aransky filled part of the gap, he gave no assistance in assessing the arrangement in terms of amount of fee or duration. There was no evidence of any payments made. Taxpayer attempts to bootstrap by pointing to the earlier decisions in this case. In his brief of June 2, 1986, taxpayer admitted that an "exact amount to be received was never specified," but argues that both courts have found that amounts due in general from taxpayer's consulting agreements ranged from $500.00 to $1,500.00 per month. *Adelson* I, 1 Cl.Ct. at 63, 553

F.Supp. 1082; *Adelson* III at 1571. Those amounts may be accurate for other companies, but that generalized observation cannot substitute for evidence which taxpayer concedes does not appear with respect to Entervolve.

■ Taxpayer's equity interest in Entervolve was admittedly attenuated. He owned 10,000 shares for which he had invested nothing. His potential need to protect money at risk was thus nonexistent. As discussed earlier, however, that does not mean he was not motivated by his equity interest. Although the court gives greater weight to interests representing personal financial risk, there was still present in July 1969 the possibility that there would be a public offering which would retire the loan and give a financial impetus to the company, which could favorably affect his stock value. Although this interest is small,[8] in the absence of any evidence to meaningfully assess the value of taxpayer's consulting arrangement, or the degree to which that arrangement played a role in the loans, the court concludes that taxpayer has not carried his burden of proof with respect to the loan to Entervolve.

### E. Factory East

### 1. Fact Findings

Factory East, Inc. (Factory East) was a discotheque developed by taxpayer's brother. It was incorporated in Massachusetts on September 22, 1969. Plaintiff was treasurer, a director, and an incorporator of Factory East.

Plaintiff advanced $18,000.00 to Factory East on July 31, 1969. On October 14, 1969 he loaned it $5,235.00. These advances were not evidenced by promissory notes and were unsecured. Of these amounts, taxpayer was repaid $5,500.00. Taxpayer also made payments totalling $16,834.00 on behalf of the company between July and October 1969. In addition, taxpayer unconditionally guaranteed loans

---

8. The court once again rejects defendant's circular reasoning with respect to use of the loan in question and the collateral he advanced for his own borrowings as evidence of a greater non-business interest. Nor is the ratio of debt to asserted income interest a factor.

to Factory East in November 1969 and April 1970. Taxpayer paid $4,621.00 on the latter guarantee from 1973 through 1978.

Defendant argues that the monies which taxpayer advanced to or on behalf of Factory East could not have been in exchange for the promise of a continuing financial consulting arrangement since he testified that the arrangement was made in "either late summer or early fall" of 1969. Virtually all of taxpayer's advances were made in July 1969; most toward the end of the month. The court finds that the taxpayer's characterization 13 years later of the time of the consulting arrangement as "late summer" is not inconsistent with the July date.

Taxpayer's responses to defendant's counsel support a finding that the loans were conditioned on the financial consulting agreement:

Q. Did your brother promise to give you $500.00 a week in exchange, correct?

A. That's correct.

Q. For your financial consulting services?

A. That's correct and all the other things. I was going to handle all the financial, the legal matters and stuff like that, including the license. (Tr. 153.)

Both taxpayer and his brother testified that taxpayer was a nominal owner of the stock of Factory East, although they were unable to produce any written agreement to that effect. Based on that testimony the court in *Adelson* I found that taxpayer was not the beneficial owner of Factory East. In *Adelson* III the appellate court relied on this finding in concluding that the loans, including those to Factory East, were bona fide debts. It specifically rejected defendant's characterization of the finding as "bizarre" by pointing out that the finding had not been challenged on that appeal. 737 F.2d at 1572 n. 4. An examination of defendant's brief on appeal of *Adelson* IV does not reveal such a challenge in the second appeal,[9] despite the fact that defendant recited conflicting evidence. In re-

manding, the court directed only *additional* findings to be made. In any event, the evidence supports the taxpayer's assertion. Beside the testimony of the two Adelsons, there is the inherent improbability of the logical import of defendant's argument, which is that taxpayer was the sole potential beneficiary of his brother's project. Under these circumstances, the court will assume that taxpayer had no equity interest in Factory East.

Beyond the $5,500.00 repayment, taxpayer received no other funds from Factory East. It was unable to make any further repayments or pay his fee. Although the discotheque was open at the beginning of 1970, sometime that year it ceased doing business, and a secured lender foreclosed on the company's furniture, fixtures, and equipment.

2. Application

■ Taxpayer's business motivation consists of a possible yearly pretax income of $26,000.00. This is somewhat minimized in significance by the fact that he never received any of this money, made no effort to collect arrears, and extended small additional sums some months after the arrangement had theoretically begun. In addition, defendant can point to the fact that taxpayer may have been motivated by a desire to help his brother. With respect to the latter factor, however, the appellate court affirmed the conclusion that the loans to Factory East were bona fide debts, thus minimizing the weight which can be given to that consideration. Appellant's failure to collect or pursue arrearages is also consistent with the contingent nature of the entire arrangement. Taxpayer would collect his money only if the venture succeeded. It failed quickly and it no doubt came as little surprise to taxpayer that he would not be able to earn his fee. The loan guarantees apparently postdated the loans and are thus not a factor. Finally, most persuasive is the fact that taxpayer's equitable interest is nonexistent. De-

---

**9.** In fact, defendant's recitation of factual background in its appeal brief includes the statement that although taxpayer paid $5,000.00 for 100 percent of Factory East stock, he testified he was merely a nominee.

spite the somewhat equivocal nature of the evidence, the court concludes that the taxpayer's interest in generating a stream of annual income from his consulting business was the dominant motivation for his loans to Factory East.

## F. Orgonics

### 1. Fact Findings

Orgonics, Inc. ("Orgonics") was incorporated in Rhode Island on April 6, 1961, under the name of Lite-Gro Chemical Corp. It did not become active until 1967, however, when production started and when the corporate name was changed to Orgonics. The company was engaged in the commercial application of organic waste products.

Taxpayer testified that in July 1969 he became involved for the first time with Orgonics. In that month he acquired an option to purchase, at par, 30,000 shares of Orgonic's common stock. Contemporaneously, he entered into a consulting agreement in order to give the company financial advice in connection with opening new plants and generally expanding the business through a public offering. The only documentary evidence of this agreement is a copy of a letter from Adelson to the company. It recites that taxpayer would be retained effective immediately for a period of three years as a financial consultant. His first year's compensation would be $500.00 per month; during years two and three he would receive $1,000.00 per month. This letter agreement is not signed by either taxpayer or on behalf of the company, although Adelson testified an original was executed.

Taxpayer's testimony is corroborated by the draft offering circular developed for the anticipated public offering which refers to taxpayer as the company's "financial consultant" as of July 1969. The court therefore accepts taxpayer's testimony that he had an agreement with Orgonics to do consulting for a three-year period for a total anticipated compensation of $30,-000.00.

In August 1969 an employee of taxpayer's, Francis Bowden, loaned Orgonics $25,-000.00. Taxpayer testified that those amounts were actually advanced by him as an inducement to the consulting arrangement. Previous decisions in this case have found that all the loans were bona fide debts; consequently, the issue of whether the taxpayer was the true lender is foreclosed in favor of taxpayer.

In 1970, taxpayer discharged a $25,-000.00 liability as guarantor of a loan to an unrelated company by assigning 10,000 Orgonics options. Taxpayer reported a $24,-000.00 gain on that transaction on his 1970 tax return, reflecting a $1,000.00 basis. The record also reflects that the balance of his options were assigned in 1970, although the circumstances are not part of the record.

Although it was still operating in 1970, Orgonics had current liabilities in June 1970 of $156,567.00 versus current assets of $13,163.00, and an accumulated deficit of $206,286.00.

### 2. Analysis

█ Defendant argues that there is no evidence of a connection between the $25,-000.00 loan to Orgonics and taxpayer's agreement to do financial consulting for the company. The court disagrees. We find that taxpayer's testimony is sufficiently corroborated by the fact that the loan and consulting agreement for all practical purposes were simultaneous.

Unlike the consulting agreements with the other companies, the arrangement with Orgonics had a fixed term. In July 1969, taxpayer anticipated receiving $30,000.00 in fees over a 3–year period. This figure has to be somewhat discounted by two factors, however. This sum was pretax, and, as of July 1969, its present worth was somewhat less than the amount taxpayer might eventually earn. Defendant further minimizes this interest because the agreement was contingent on a successful offering, and since taxpayer never received any fee or tried to collect arrearages. As discussed in connection with other companies, the contingency of a successful offering weighs against both taxpayer's expectation as to

his fees and as to a return on his warrants. That factor therefore does not advance defendant's argument. Likewise, taxpayer's failure to seek arrearages is consistent with the expectation of risk.

Defendant also contends that the taxpayer's interest in a return on his stock options was greater than any possible desire to protect his consulting arrangement. This factor is clouded by certain inconsistencies in the record. The parties stipulate that the taxpayer acquired an option to purchase at par "30,000 shares of Orgonics one-cent par value common stock." The draft offering circular states that the company "gave an option to buy at par 30,000 shares of the company's *15¢* par value common stock to a financial consultant." (Emphasis added.) The remaining commentary makes it clear that the statement refers to taxpayer. The import of the stipulation and circular is that taxpayer did not pay for the options. Nevertheless, on his 1970 tax return, plaintiff indicates a $1,000.00 cost in 10,000 shares, although there is no indication he ever exercised the options. No attempt is made in the record to clear up either discrepancy. For the purposes of weighing the taxpayer's interest, however, the result is much the same regardless of whether it is assumed that taxpayer paid $3,000.00, or paid nothing, or whether the stock was 1¢ or 15¢ par value. If he paid nothing, his potential profit was greater, but his capital at risk was zero. If he paid $3,000.00 his potential profit was less but he had an interest in protecting an after-tax investment. Given the relatively small amounts involved, the court treats either scenario as adding to taxpayer's nonbusiness interest to approximately the same degree.

It is difficult to assess the profit potential of the taxpayer's warrants, partly for reasons already discussed. Defendant points to two somewhat inconsistent indicators. First, defendant argues that the $24,-000.00 gain taxpayer reported or sale of 10,000 warrants in 1970 is indicative of their value in 1969. It also points to the potential increase in value in connection with a public offering anticipated for late 1970, a time when taxpayer no longer owned the warrants.

Considering the fact that the profitable assignment was apparently *sui generis* and in any event also apparently unanticipated in 1969, the court will focus on the taxpayer's investment, and for a general guide, on the effect anticipated by the public offering. Taxpayer had invested from zero to $3,000.00 in 30,000 warrants for stock which could be purchased for $4,500.00. The prospectus indicates that the public offering would raise the book value of a share to about 50¢. If he did elect to purchase, his stock cost would be from $4,500.00 to $7,500.00. His potential gain around the time of the anticipated offering would have been from $7,500.00 to $10,-500.00. Although the $30,000.00 in fees must be discounted as being pretax and because they would be payable over three years, taxpayer's potential reasonable short-term gain on the stock would also have to be discounted for the same reasons, although somewhat less, since the tax rate would be lower and the return would be faster. Nevertheless, a comparison of the potential interests leads the court to conclude that the dominant motive for the *$25,000.00* loan to Orgonics was to generate business income.

### IV. *Interest*

The deductibility of the $41,504.10 in interest paid in 1969 as a business expense under § 162 of the Code turns on whether the loans were proximately related to taxpayer's financial consulting business. The court has now found that loans to two of the companies to which taxpayer lent borrowed funds—Factory East and Cutlass Aviation—were motivated predominantly by a business interest. It follows that interest paid on borrowed monies loaned to those corporations is deductible under § 162. Interest on monies loaned to E.B.V., CTL, and Entervolve is not deductible under that section.

### V. *Conclusion and Procedure for Remaining Issues*

The Court concludes that taxpayer has proven that his loans to Cutlass Aviation, Factory East, and Orgonics were business

debts for purposes of § 166. Taxpayer has not proven that his loans to CTL, E.B.V., and Entervolve had a dominant business motivation, and thus they will be treated as nonbusiness debts within the meaning of § 166.

Two issues remain to be resolved by this court—the amount which may be claimed in 1969 as part of a bad debt reserve, and whether the $18,741.61 in interest paid to Colonial Bank, Newton-Waltham Bank, Norfolk County Trust, Alan Blackman, Georgio Realty Trust, and Samuel Harris ("other interest") are deductible under § 162. The parties have not been specifically asked in the present remand to argue those issues, although the court considers them ripe for determination.[10] Prior to seeking additional argument from the parties, however, the court directs the parties to attempt to reach a total resolution of all outstanding matters, specifically including agreement on the following:

1. the total amount of unpaid loans potentially deductible under § 166 made to Cutlass Aviation, Factory East, and Orgonics;

2. an appropriate bad debt reserve for those loans;

3. the amount of interest deductible under § 162 on borrowed monies which were advanced to Factory East and Cutlass Aviation;

4. the disposition of "other interest." The court will allow the parties until June 1, 1987, to voluntarily resolve these matters in whole or in part. By agreeing to a disposition of them, the parties do not, unless otherwise specifically agreed to, waive their right to challenge the court's findings and conclusions made in this decision with respect to the deductibility of loans under § 166.[11] The parties are directed to file a status report with the Clerk on or before June 15, 1987, stating which, if any, matters are resolved, and the amount of any judgment to be entered.

---

10. In *Adelson* III the appellate court instructed that

> in the event the Claims Court decides that any of the loans were not made pursuant to a dominant motivation to further taxpayer's business interest, the court should redetermine the amount subject to an allowance for addition to the bad debt reserve.

737 F.2d at 1575.

11. By merely agreeing to a figure for entry of judgment, neither party waives its right to appeal or otherwise challenge the conclusions upon which liability is premised or rejected under § 166(a). The parties would be waiving the right to challenge the calculation of interest, bad debt reserve, and amount of outstanding loans.